Jose LLACH, Appellant,

v.

**UNITED STATES of America, Appellee.**

No. 83–2444.

United States Court of Appeals,
Eighth Circuit.

Submitted April 10, 1984.

Decided July 23, 1984.

Rehearing Denied Aug. 23, 1984.

1325

Law Offices of Penzell & Diamond, P.A., Miami, Fla., for appellant.

Rodney S. Webb, U.S. Atty., Gary Annear, First Asst. U.S. Atty., Fargo, N.D., for appellee.

Before LAY, Chief Judge, and McMILLIAN and JOHN R. GIBSON, Circuit Judges.

McMILLIAN, Circuit Judge.

Jose Llach appeals from a final judgment entered in the District Court[1] for the District of North Dakota after a jury trial finding him guilty of conspiracy, two counts of aiding and abetting distribution of cocaine and use of the telephone in connection with drug trafficking. Llach was sentenced to a total of twelve years imprisonment followed by three years of special parole. For reversal Llach argues that the district court erred in (1) admitting evidence of other crimes, (2) admitting out-of-court declarations of coconspirators, (3) refusing to declare a mistrial because of judicial and prosecutorial misconduct, (4) failing to conduct proper voir dire, and (5) denying Llach's motion for acquittal. For the reasons discussed below, we affirm.

In mid-November 1981, Fargo, North Dakota, Drug Enforcement Administration (DEA) agent Charles Lee received a confidential tip that a man named Fred John McConeghy was interested in transporting

1. The Honorable Ben Krentzman, United States Senior District Judge for the Middle District of Florida, sitting by designation in the District of North Dakota.

illegal drugs to Fargo. Shortly thereafter, agent Lee telephoned McConeghy in Florida to discuss the purchase of marijuana and cocaine. Lee recorded this and subsequent telephone conversations he had with McConeghy. McConeghy contacted his companions, Alex Tindall and Buford Levin Higgs, to discuss the acquisition of three kilos of cocaine. Higgs then contacted Llach to see if he could acquire the necessary cocaine. Higgs had previously associated with Llach in connection with other drug transactions. Llach, a naturalized United States citizen originally from Colombia, served as middleman for deals between Colombian sources of narcotics and distributors in the United States. Llach informed Higgs that he would be able to obtain the cocaine.

Higgs chartered a plane on December 18, 1981, which flew McConeghy and Tindall from Sanford, Florida, to Fort Lauderdale, Florida, to meet with Higgs. Driving Llach's car, Higgs picked them up at the airport and they spent the night in a Holiday Inn. Higgs maintained constant telephone contact with Llach. The next day Higgs, Tindall and McConeghy drove in Llach's car to an apartment complex in Miami. Llach came out of an apartment and was approached by Higgs and Tindall. Llach handed Higgs a plastic bag containing one-half kilo of cocaine, which Higgs placed in the trunk of Llach's car.

Higgs, Tindall and McConeghy proceeded to the Fort Lauderdale airport where a chartered plane and pilot waited to fly them to Fargo. Higgs removed the cocaine from the car's trunk, placed it in his suitcase and then boarded the plane with the others.

Because of bad weather, the men were forced to make an overnight stop in Nashville, Tennessee. McConeghy contacted Lee to inform him of the delay, thereby enabling Lee to arrange airport surveillance by federal, state, and local drug enforcement agencies. The men arrived in Fargo on the morning of December 20, 1981.

McConeghy telephoned Lee upon his arrival in Fargo. Lee instructed McConeghy to go to the Holiday Inn. Higgs and McConeghy took the cocaine to the designated Holiday Inn where McConeghy registered under an assumed name. McConeghy called Lee to arrange a meeting.

Around 1:30 p.m., Lee met with McConeghy at a Perkins Restaurant parking lot. The meeting was held in Lee's car. McConeghy gave Lee a Holiday Inn envelope which contained a sample of cocaine and Lee showed McConeghy the money. At that time McConeghy informed Lee that he was only able to obtain one-half kilo of cocaine.

Lee placed the envelope in his glove compartment and drove McConeghy back to the hotel. Afterwards, Lee had the substance contained in the envelope tested and determined that cocaine was present. The remaining substance was sealed, marked as evidence, and left at the Fargo DEA office.

Around 3:00 p.m. on December 20, Lee phoned McConeghy and Higgs at the Holiday Inn to inform them that he wished to purchase the eighteen ounces of cocaine in their possession. Higgs told Lee he would get the rest of the three kilos for him.

Higgs gave McConeghy the cocaine. Higgs then called Tindall at the Fargo airport and made two calls to Llach in Florida to arrange for the delivery of the remainder of the cocaine.

McConeghy took a taxi to Perkins Restaurant to meet with Lee. He arrived around 4:30 p.m. and got into Lee's car. McConeghy gave Lee a shopping bag containing the cocaine. Lee went to the trunk of his car, presumably to get the money. Instead, Lee signaled onlooking officials and McConehgy was arrested. Higgs, Tindall and McConeghy were all convicted on various counts connected with this transaction. At Llach's trial, these three men testified on behalf of the government. Their testimony described Llach's participation in this and other drug transactions and traced the chronology of events in Florida and North Dakota.

*Evidence of Other Crimes*

Llach challenges the admission of evidence concerning his previous participation in the importation, distribution, and sale of methaqualone and marijuana, arguing that transactions involving substances other than cocaine are inadmissible and highly prejudicial.

■ Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that his or her conduct on a particular occasion was in conformity with it. However, evidence of prior conduct which may constitute a separate crime may be offered to prove motive, intent, opportunity, knowledge, preparation, common scheme or plan, identity, or absence of mistake or accident. Fed.R.Evid. 404(b).

■ In *United States v. Miller*, 725 F.2d 462 (8th Cir.1984), this court reiterated the well-established requirements for admission of other crimes evidence:

> (1) the evidence of the other act must be relevant to a material issue; (2) the other act must be similar in kind and reasonably close in time to the crime charged; (3) the evidence of the other act must be clear and convincing; and (4) the probative value of the evidence must not be outweighed by its prejudice.

*Id.* at 466 (citations omitted). In addition, if the court finds the evidence admissible, a limiting instruction should be given. *Id.*

■ In the instant case, the evidence of the previous drug transactions was relevant to prove intent and common scheme or plan. The other acts were sufficiently similar because they involved drug transactions arranged by Llach, Tindall, Higgs, and others who participated in the cocaine transactions for which Llach was tried. In the present case, the previous transactions overlapped the negotiations for the charged violations; therefore, it was reasonable to conclude that the transactions were relatively close in time. Higgs, Tindall and another coconspirator testified at trial regarding Llach's participation in the previous transactions. Direct testimony of the defendant's participation in the prior transactions is sufficient to meet the clear and convincing standard. *See United States v. Evans*, 697 F.2d 240, 248 (8th Cir.), *cert. denied*, 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 352 (1983). In determining whether the prejudicial impact of the challenged evidence outweighed its probative value, the district court is afforded broad discretion. *See United States v. Miller*, 725 F.2d at 466. Llach has not demonstrated that such discretion was abused in this case. Finally, the district court properly instructed the jury concerning the narrow purpose for which the evidence of other crimes was admitted. We hold, therefore, that the district court did not abuse its discretion in admitting the evidence of other crimes.

*Coconspirators' Statements*

Llach argues that the district court improperly admitted out-of-court declarations of coconspirators as evidence against him. The government urges that the statements were properly admitted under Fed.R.Evid. 801(d)(2)(E). We agree that the statements were properly admitted.

■ An out-of-court declaration of a coconspirator is admissible against a defendant if the district court makes a preliminary determination that the government demonstrated that (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the declaration was made during the course and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E). Admissibility of the evidence is conditioned upon the presentation of sufficient independent evidence to establish the existence of a conspiracy. *United States v. Bentley*, 706 F.2d 1498, 1506 (8th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984); *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir.1978). In *United States v. Bell*, this court set forth guidelines for the admissibility of such statements:

> (1) If the prosecutor propounds a question which obviously requires a witness to recount an out-of-court declaration of an alleged coconspirator, the court, upon

a timely and appropriate objection by the defendant, may conditionally admit the statement. At the same time, the court should, on the record, caution the parties (a) that the statement is being admitted subject to defendant's objection; (b) that the government will be required to prove by a preponderance of the independent evidence that the statement was made by a coconspirator during the course and in furtherance of the conspiracy; (c) that at the conclusion of all the evidence the court will make an explicit determination for the record regarding the admissibility of the statement; and (d) that if the court determines that the government has failed to carry the burden delineated in (b) above, the court will, upon appropriate motion, declare a mistrial, unless a cautionary instruction to the jury to disregard the statement would suffice to cure any prejudice. The foregoing procedural steps should transpire out of the hearing of the jury.

(2) After a ruling on the record that the out-of-court declaration is admissible under Rule 801(d)(2)(E), the court may submit the case to the jury. The court should not charge the jury on the admissibility of the coconspirator's statement, but should, of course, instruct that the government is required to prove the ultimate guilt of the defendant beyond a reasonable doubt. An appropriate instruction on credibility should be given, and the jury should be cautioned with regard to the weight and credibility to be accorded a coconspirator's statement.

573 F.2d at 1044 (citations omitted).

Llach does not argue that the district court failed to adhere to this procedure. At trial the coconspirators' out-of-court statements were conditionally admitted over Llach's objections. At the close of the government's case the district court ruled that

[t]he government has established that a conspiracy existed and that the following, at least, were members of the conspiracy: Fred J. McConeghy, Alex Tindall, Buford Higgs, I'm not sure about

Gary Hamilton, at least as to those charges. Lee, a government agent, of course, could not be a co-conspirator, but I find that McConeghy, Tindall, Higgs were members of the conspiracy and that the statements which have been received, the out-of-court statements which otherwise would have been hearsay by them as to what other people said, so forth, that all of those were subject to being received by this rule, that those statements were made during the course of and in furtherance of the conspiracy and so I find them to be admissible.

The court instructed the jury that the government was required to prove guilt beyond a reasonable doubt. The court also gave an appropriate instruction on credibility and cautioned the jury regarding the weight afforded a coconspirator's testimony.

▪ Llach asks this court not to adhere to the procedure enunciated in *United States v. Bell* and to adopt the procedure set forth in *United States v. James*, 590 F.2d 575 (5th Cir.) (banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), requiring prior proof of conspiracy:

Both because of the "danger" to the defendant if the statement is not connected and because of the inevitable serious waste of time, energy and efficiency when a mistrial is required in order to obviate such danger, we conclude that the present procedure warrants the statement of a preferred order of proof in such a case. The district court should, whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it before admitting declarations of a coconspirator. If it determines it is not reasonably practical to require the showing to be made before admitting the evidence, the court may admit the statement subject to being connected up.

*Id.* at 582. This court has repeatedly declined to require prior proof of conspiracy

and we choose not to depart from the procedure set forth in *Bell*.[2]

Additionally, Llach argues that the government failed to present sufficient independent evidence of the conspiracy's existence and Llach's participation in it.

 Sufficient independent evidence exists "if on the independent evidence the district court is satisfied that it is more likely than not that the statement was made during the course and in furtherance of an illegal association to which the declarant and the defendant were parties." *United States v. Bell*, 573 F.2d at 1044. When making a preliminary determination of admissibility, "[t]he trial judge ... has wide discretion and must be satisfied only that there is independent evidence, credible and sufficient to support a finding of a joint undertaking. The independent evidence of illicit association may be completely circumstantial or may consist of the coconspirator's own conduct and admissions." *United States v. Sholle*, 553 F.2d 1109, 1117 (8th Cir.1977), *cert. denied*, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1978). *See also United States v. Bentley*, 706 F.2d at 1506; *United States v. Williams*, 604 F.2d 1102, 1113 (8th Cir.1979); *United States v. Bell*, 573 F.2d at 1044.[3]

 We agree that the government proved by a preponderance of the evidence the existence of a conspiracy to distribute and possess with the intent to distribute cocaine between McConeghy, Higgs, Llach, and Tindall. McConeghy, Higgs, Tindall, and agent Lee testified about their negotiations, agreement, and preparation, and Llach's role in the arrangement. Llach's own conduct provided sufficient evidence under the prevailing standards to establish his participation in the conspiracy. Higgs testified that Llach provided him with his car for the purpose of picking up the drugs and transporting them to the Florida airport. In addition, Higgs and Tindall testified that Llach personally delivered the cocaine to them before they left for North Dakota. Thus, we hold that the district court properly admitted the coconspirators' statements under Fed.R.Evid. 801(d)(2)(E).

*Judicial and Prosecutorial Misconduct*

Llach argues that on several occasions during the course of the trial the district court improperly injected itself on behalf of the government. Llach argues that this misconduct prejudiced him by depriving him of a fair trial and that he should be granted a new trial. These instances of judicial "misconduct" include "interruptions" by the court during defense counsel's cross-examination of witnesses and a display of "sarcasm" and "impatience" by the court toward defense counsel.

 This court has often stated that a "judge conducting a jury trial in a federal court is more than a 'mere moderator;' he is 'the governor of the trial for the purpose of assuring its proper conduct.'" *Dranow v. United States*, 307 F.2d 545, 572 (8th Cir.1962), *citing Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 698, 77 L.Ed. 1321 (1933). *See also United States v. Woods*, 696 F.2d 566, 570–71 (8th Cir. 1982). Generally "statements made by the trial judge are not cause for reversal unless prejudicial error is apparent ... [and] each record must speak for itself in determining if improper comments by the judge were prejudicially erroneous." *United States v. Woods*, 696 F.2d at 571 (citations omitted).

> [The trial judge] has the prerogative, and at times the duty, of eliciting facts he deems necessary to the clear presentation of the issues. To this end he may

---

2. The author believes the better procedure would be to conduct pretrial hearings on the admissibility of the statements or require the government to prove the existence of a conspiracy during its case-in-chief prior to the admission of the coconspirator's statements. *United States v. Howard*, 706 F.2d 267, 270–71 (8th Cir.) (McMillian, J., concurring), *cert. denied*, — U.S. ——, 104 S.Ct. 341, 78 L.Ed.2d 309 (1983).

3. Of course, the jury must still find the existence of a conspiracy beyond a reasonable doubt, but this preliminary determination is relevant only to the admissibility of a coconspirator's statements, not to the ultimate determination of guilt.

examine witnesses who testify, so long as he preserves an attitude of impartiality and guards against giving the jury an impression that the court believes the defendant is guilty.

*Id., citing Dranow v. United States,* 307 F.2d at 572.

■ We have carefully reviewed the record, paying particular attention to the portions of the transcript referred to by Llach and we find no prejudicial error. As in *United States v. Woods,* 696 F.2d at 570, most of the court's comments in the present case were not made within the hearing of the jury. The other comments were either rulings on government objections or questions from the bench addressed to witnesses in an effort to clarify testimony. Throughout the trial the court remained impartial. We are satisfied that the jury was not influenced in any way by the conduct of the judge, and Llach, therefore, was not deprived of a fair and impartial trial.[4]

We are, however, more disturbed by statements made by the prosecutor during his rebuttal closing argument:

MR. ANNEAR: In closing, I'd like to state that Mr. Higgs and Mr. Tindall and Mr. McConeghy have been brought to the bars of justice and have answered to their crimes and punished by the Court and I submit to you now that it's up to you to decide what fate lies for the Defendant, Jose Llach. We ask he has to answer for his crimes charged or I submit to stand before this Court for punishment as Mr. Higgs, Mr. McConeghy and Mr. Tindall have done, or you are to decide whether or not he would be free to, I submit, to go out and conduct himself as he has in the past and I submit to you as a purveyor of drugs in the streets of this country.

MR. DIAMOND: Objection. Improper argument.

THE COURT: Overruled. Go ahead.

Llach contends that these remarks prejudiced his case before the jury in such a manner to warrant a new trial.

Improper statements made by prosecutors during closing arguments have been a persistent problem in this Circuit. We have repeatedly instructed prosecuting attorneys regarding their role in the adversary process and the proper bounds of closing arguments. *See, e.g., United States v. Michaels,* 726 F.2d 1307 (8th Cir.1984); *United States v. Auerbach,* 682 F.2d 735 (8th Cir.), *cert. denied,* 459 U.S. 911, 103 S.Ct. 219, 74 L.Ed.2d 174 (1982); *United States v. Singer,* 660 F.2d 1295 (8th Cir. 1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982); *United States v. Segal,* 649 F.2d 599 (8th Cir.1981); *United States v. Bohr,* 581 F.2d 1294 (8th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978).

■ However, the district court has broad discretion in controlling closing arguments. *United States v. Michaels,* 726 F.2d at 1315. This court will not reverse absent a showing of abuse of discretion. *Id.* We must decide whether the objectionable comments were so offensive, when considered in the context of the entire trial, as to deprive Llach of a fair trial. *Id.*

■ The prosecutor's reference to freeing Llach to commit more crimes was irrelevant, unnecessary and dangerously close to the line of demarcation between permissible and impermissible statements during closing arguments. However, the evidence in this case was substantial, and the court, in its general instructions to the jury, carefully cautioned the jury to consider only the evidence in arriving at their verdict. Thus, when viewed in light of the entire

---

4. Compare the district court's conduct in the present case with the trial judge's conduct in *United States v. Singer,* 710 F.2d 431 (8th Cir. 1983) (banc). In that case the district court repeatedly injected itself into the trial, essentially assuming the role of prosecutor and unavoidably giving the jury the impression of onesided-

ness. In the presence of the jury, the judge suggested that an additional assistant be assigned to try the case against reputable defense attorneys, admonished the prosecutor for his manner of questioning, and examined and cross-examined witnesses for the government. *Id.* at 432.

trial, the prosecutor's remarks do not constitute reversible error. This court cautions the government, however, that

> [t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*United States v. Berger,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1934).

*Voir Dire*

Llach, a naturalized United States citizen of Colombian ancestry, maintains that his conviction should be reversed because the district court refused to ask prospective jurors whether Llach's Latin ancestry would affect their ability to render an impartial decision. Following preliminary voir dire, the district court asked whether there were any other questions defense counsel wished to propose. Defense counsel responded, "Without waiving any of the requests I have, I'm most interested in whether or not it would prejudice them in any way the fact that the accused would come from south Florida." [5]

The district court refused Llach's request explaining:

> Let me say this: the Defendant's name, I spelled it for them. Looking at it, they

looked at him. I'm told that the basic population stock of this area, I read this in a magazine, from Canada, Germany, Scandinavia and possibly Russia. This is a nation of immigrants. My father was an immigrant and I don't intent to ask if they are going to be fair to somebody, the background, I wouldn't ask them to be fair to somebody German or Russian or anybody else. They are an American citizen and I am going to ask them each individually, I have not yet, but before you're required to exercise your challenges I'll ask each of the jurors if they could and will fairly and impartially try the issues of facts in this case with this defendant and the government so in effect I will include that, I won't pinpoint that.

The district court did not ask any specific questions concerning ethic prejudice, but did ask general questions concerning prejudice and impartiality.

█ As the Supreme Court said in *Rosales-Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (*Rosales-Lopez*),

> [*v*]oir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts.
>
> Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both

---

5. Prior to voir dire, Llach submitted two other questions aimed at detecting possible ethnic prejudice:
"3a. Would the fact that the accused is of Spanish background affect your ability to fairly try this case?"

"20. Do you feel you can sit as a fair and impartial juror at the trial of a Latin defendant?"

must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions. In neither instance can an appellate court easily second-guess the conclusions of the decisionmaker who heard and observed the witnesses.

Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire.*

*Id.* at 188–89, 101 S.Ct. at 1634 (citations and footnotes omitted). Failure to question the jury concerning ethnic or racial prejudice is constitutionally infirm only if ethnic or racial issues are "inextricably bound up with the conduct of the trial," *Ristaino v. Ross,* 424 U.S. 589, 596, 96 S.Ct. 1017, 1021, 47 L.Ed.2d 258 (1976) (*Ristaino*), or the circumstances in the case "suggest a significant likelihood that racial prejudice might infect [the defendant's] trial." *Id.* at 598, 96 S.Ct. at 1022. *Ristaino,* a habeas corpus case, involved a violent criminal confrontation between a black defendant and a white security guard. Those facts alone, however, did not create a constitutional obligation to question the jury about racial prejudice. *Id.* at 597, 96 S.Ct. at 1021.[6] *Accord United States v. Bell,* 573 F.2d at 1042–43 (black defendant convicted by white jury for transferring sawed-off shotguns without paying required transfer tax).

 In *Rosales-Lopez,* the defendant, of Mexican descent, was convicted of participating in a plan to smuggle illegal Mexican aliens into the United States. The Court said that "[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups," 451 U.S. at 190, 101 S.Ct. at 1635, and failed to hold the federal district

court's refusal to inquire on voir dire into racial or ethnic prejudice as constitutional error. *Id.* Similarly, such inquiry is not constitutionally mandated in the present case.

 Based on its supervisory authority over the federal courts, the Supreme Court, in *Rosales-Lopez,* noted that there is a non-constitutional duty on the part of the federal district courts to propound such questions in certain circumstances. 451 U.S. at 190, 101 S.Ct. at 1635. The purpose of this duty is to assure that the "appearance of justice in the federal court" is maintained. *Id.* The Court noted:

In our judgment, it is usually best to allow the defendant to resolve this conflict by making the determination of whether or not he would prefer to have the inquiry into racial or ethnic prejudice pursued.[7] Failure to honor his request, however, will be reversible error only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury.

---

[7] Of course, the judge need not defer to a defendant's request where there is no rational possibility of racial prejudice. But since the courts are seeking to assure the appearance and reality of a fair trial, if the defendant claims a meaningful ethnic difference between himself and the victim, his *voir dire* request should ordinarily be satisfied.

*Id.* at 191, 101 S.Ct. at 1635. Providing some guidance as to what constitutes a "reasonable possibility" that a jury might be so influenced, the Supreme Court noted:

[F]ederal trial courts must make such an inquiry when requested by a defendant accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups. This supervisory rule is based upon and consistent with the "reasonable possibility standard" articulated above. It remains

---

**6.** The Supreme Court found, however that it was reversible error for the state court to refuse to ask a question concerning racial prejudice in *Ham v. South Carolina,* 409 U.S. 524, 527, 93 S.Ct. 848, 850, 35 L.Ed.2d 46 (1973). In *Ham*

the defendant was a well-known black civil rights activist charged with a drug offense. His defense was that he had been "framed" in retaliation for his civil rights activities.

an unfortunate fact in our society that violent crimes perpetrated against members of other racial or ethnic groups often raise such a possibility. There may be other circumstances that suggest the need for such an inquiry, but the decision as to whether the total circumstances suggest a reasonable possibility that racial or ethnic prejudice will affect the jury remains primarily with the trial court, subject to case-by-case review by the appellate courts.

*Id.* at 192, 101 S.Ct. at 1636.[7] Where, as in the present case, the defendant is charged with a non-violent victimless crime, such inquiry is not mandated and the reviewing court should consider the "effectiveness of the trial court in reasonably assuring that the prejudice would be discovered if present." *United States v. Groce,* 682 F.2d 1359, 1362–63 (11th Cir.1982) (citations omitted). If voir dire was conducted in such a manner to eliminate a reasonable possibility that racial or ethnic prejudice might influence the jury's evaluation of the evidence, then there is no reversible error. *Rosales-Lopez,* 451 U.S. at 192–93, 101 S.Ct. at 1636.

In the present case, although the district court refused to inquire specifically about the prospective jurors' possible ethnic prejudice, the district court did try to assure impartiality. With Llach present in the courtroom, the court spelled and pronounced his name. The prospective jurors were asked as a group and individually whether they could serve fairly and impartially. *See United States v. Groce,* 682 F.2d at 1363. The court also considered the extent of pretrial publicity surrounding this case and the ethnic sentiment in Fargo towards Latins and concluded that there was no unusual potential for ethnic prejudice. Certainly the trial judge did not ignore the issue of prejudice. Llach does not point to any specific ethnic factors that would infect the trial.

Although the better practice would have been to honor Llach's request, we cannot say that the trial court abused its discretion or that its refusal to ask the question caused a reasonable possibility that the jury's decision might be influenced by prejudice. *United States v. Groce,* 682 F.2d at 1363.

### Sufficiency of the Evidence

Finally, Llach argues that the evidence was insufficient to establish his guilt beyond a reasonable doubt. The jury verdict "must be sustained if there is substantial evidence in the record to support it, taking the view of the evidence most favorable to the government." *United States v.*

---

**7.** Although this court is constrained to follow *Rosales-Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981), the author agrees with the dissent in *Rosales-Lopez,* that the majority opinion is based on an overly restrictive interpretation of *Aldridge v. United States,* 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). As the dissent notes, although *Aldridge* involved "special circumstances," i.e. interracial, violent crime, neither the reasoning in the opinion for the Court, nor the reasoning in the state court opinions quoted at length by the Court in *Aldridge* relied on those special circumstances. *See Rosales-Lopez,* 451 U.S. at 197–01, 101 S.Ct. at 1638–40 (Stevens, J., dissenting).

The purpose of voir dire is to assure that a defendant is tried before an impartial and unbiased panel of jurors. Although certain cases will necessarily engender prejudice or bias, thus giving rise to special circumstances, there are jurors who harbor prejudices against all members of a race, religion or ethnic group for reasons totally unrelated to the facts of the case. If a prospective juror is prejudiced against Lat-ins, it is illogical that courts only seek to exclude such a juror when interethnic, violent crime is involved. No biased or prejudiced juror should ever be permitted to sit in judgment of one against whom the juror is biased. As Chief Justice Hughes stated in *Aldridge,* 283 U.S. at 314, 51 S.Ct. at 473:

> But the question is not ... as to the dominant sentiment of the community and the general absence of any disqualifying prejudice, but as to the bias of the particular jurors who are to try the accused. If in fact, sharing the general sentiment, they were found to be impartial, no harm would be done in permitting the question; but if any one of them was shown to entertain a prejudice which would preclude his rendering a fair verdict, a gross injustice would be perpetrated in allowing him to sit.

The author, therefore, believes that the better position is to require such specific inquiry if requested unless "it can be said that the possibility of such prejudice is so remote as to justify the risk in forbidding the inquiry." *Id.* at 314, 51 S.Ct. at 473 (footnote omitted).

**1334**

*Segal,* 649 F.2d at 600 (citations omitted). We have carefully examined the record in the light most favorable to the government and conclude that there was ample evidence to support the jury verdicts.

Accordingly, we affirm the judgment of the district court.

LAY, Chief Judge, and JOHN R. GIBSON, Circuit Judge, concurring specially.

 We recognized in *United States v. Macklin,* 573 F.2d 1046 (8th Cir.1978), a case filed in tandem with *United States v. Bell,* 573 F.2d 1040 (8th Cir.1978), the following:

> The new rule requiring a specific determination of the existence of a conspiracy by the court on the record does not alter the traditional discretion of the trial judge to allow the government to place the statement into evidence on the condition that it be later shown by sufficient independent evidence that a conspiracy existed. *See United States v. Jackson,* 549 F.2d 517, 533 (8th Cir.), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977). It is preferable whenever possible that the government's independent proof of the conspiracy be introduced first, thereby avoiding the danger, recognized in *Petrozziello* [548 F.2d 20 (1st Cir.1977)], of injecting the record with inadmissible hearsay in anticipation of proof of a conspiracy which never materializes.

*Macklin,* 573 F.2d at 1049 n. 3. We adhere to that statement.

We feel under *Rosales-Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) that there is no prejudicial error committed on the voir dire in the present case. We therefore concur in the judgment affirming the conviction.