# United States Court of Appeals
## For the First Circuit

No. 09-1101

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS ELIGIO SANTANA-PÉREZ,

Defendant, Appellant.

No. 09-1150

UNITED STATES OF AMERICA,

Appellee,

v.

AQUILES CARPIO-POURET

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Héctor L. Ramos-Vega, Assistant Federal Public Defender, with
whom Joseph C. Laws, Jr., Federal Public Defender, was on brief,
for appellant Luis Eligio Santana-Pérez.
Jesús M. Rivera-Delgado for appellant Aquiles Carpio-Pouret.
William C. Brown, Attorney, Criminal Division, with whom Lanny
A. Breuer, Assistant Attorney General, Criminal Division, and Rosa

E. Rodríquez-Vélez, United States Attorney, were on brief, for appellee.

September 8, 2010

**LIPEZ**, **Circuit Judge**.  Defendants Luis Eligio Santana-Pérez and Aquiles Carpio-Pouret were found guilty of violating 18 U.S.C. § 2237(a)(1), which makes it a crime "for the master, operator, or person in charge of a vessel of the United States, or a vessel subject to the jurisdiction of the United States, to knowingly fail to obey an order by an authorized Federal law enforcement officer to heave to that vessel."[1]  They now appeal their convictions, asserting multiple trial errors and claiming that the evidence was, in any event, insufficient to support the jury's verdict.  Finding no reversible error, we affirm.

**I.**

The factual background of this appeal, which we recite in the light most favorable to the verdict, is uncomplicated.  In the pre-dawn hours of March 15, 2008, the Coast Guard cutter <u>Matinicus</u> was patrolling the Mona Passage between Puerto Rico and the Dominican Republic when a member of the crew sighted a small vessel leaving Mona Island, Puerto Rico and heading toward the Dominican Republic.[2]  The crew member reported the sighting to Chief Warrant

---

[1]  "Heave to" means "to cause a vessel to slow, come to a stop, or adjust its course or speed to account for the weather conditions and sea state to facilitate a law enforcement boarding." 18 U.S.C. § 2237(e)(2).  For clarity, we will hyphenate the phrase in the text except when quoting the statute.  <u>Cf.</u> R.H. Dana, Jr., <u>The Seaman's Friend</u> 111 (14th ed. 1879).

[2]  Mona Island lies thirty-eight miles west of the main island of Puerto Rico, about halfway between the main island and the Dominican Republic.

Officer Michael Levecque, who ordered that the Matinicus be brought about to intercept the vessel. As it later turned out, Santana-Pérez was operating the small vessel and Carpio-Pouret was also in the vessel.

At around 5:10 a.m., the crew of the Matinicus activated its blue law enforcement light on the ship's mast; shined a spotlight on the defendants' vessel; blew the ship's whistle; and began directing the defendants to stop in both English and Spanish using the ship's loud hailer. The defendants did not stop at that time. A "non-compliant boarding team" launched from the Matinicus in a small vessel at 5:15 a.m. and arrived alongside the defendants' vessel one minute later. The boarding team activated a blue light on its vessel and began commanding the defendants to "stop the vessel, stop the vessel." The defendants did not stop. The boarding team made a second approach while repeating the command to stop, but, again, the defendants did not stop. Finally, on a third approach, the boarding team told the defendants that force would be used if they did not stop. The defendants turned off their motor at that point and were taken into custody. About twelve minutes elapsed between the time the Matinicus activated its blue light and the time the defendants stopped.

The defendants were subsequently charged with failing to obey a federal law enforcement officer's order to heave-to. 18 U.S.C. § 2237(a). The government argued at trial that Santana-

Pérez should be convicted as a principal and that Carpio-Pouret should be convicted as an aider and abettor. The jury returned a verdict of guilty as to both defendants, and the district court summarily denied a post-trial motion for judgment of acquittal. This appeal followed.

## II.

The defendants raise five claims of error on appeal: (1) the district court should have entered a judgment of acquittal because there was insufficient evidence that the defendants heard and understood the Coast Guard's orders to heave-to; (2) the district court erroneously ruled that evidence relating to a prior conviction could be admitted to impeach Santana-Pérez if he testified at trial; (3) the government improperly vouched for its own witnesses during closing arguments; (4) the district court erred in refusing to give a missing evidence instruction; and (5) the district court engaged in improper questioning during Carpio-Pouret's testimony. We address each of these arguments in turn.

## A. Sufficiency of the Evidence

To prove a failure to heave-to, the government must show that (1) the defendant was the master, operator, or person in charge of the vessel; (2) an authorized federal law enforcement officer ordered the defendant to heave-to; (3) the defendant failed to obey that order; and (4) the defendant's failure to obey the

order was knowing and intentional.[3]  See 18 U.S.C. § 2237(a)(1), (b).  To establish aiding and abetting liability, the government must show: (1) that the principal "committed the substantive offense charged," and (2) that the accomplice "became associated with [the principal's criminal] endeavor and took part in it, intending to assure its success."  United States v. Gonzalez, 570 F.3d 16, 28-29 (1st Cir. 2009) (internal quotations marks and citations omitted).  On review for sufficiency, we ask whether the evidence, viewed in the light most favorable to the prosecution, would permit a reasonable jury to find each element beyond a reasonable doubt.  See United States v. Rosado-Pérez, 605 F.3d 48, 52 (1st Cir. 2010).

---

[3]   There must also be proof that the vessel operated by the defendant was a vessel of the United States or a vessel subject to the jurisdiction of the United States.  See 18 U.S.C. § 2237(a)(1).  In this case, the district court instructed the jury that the defendants' vessel would be subject to the jurisdiction of the United States if it was "located within the customs waters of the United States," an area that "extend[s] for four leagues, or twelve miles, from United States territory unless another distance has been established by treaty."  United States v. Santana-Rosa, 132 F.3d 860, 863-64 (1st Cir. 1998) (internal quotation marks omitted); see also 46 U.S.C. § 70502(c)(1)(D) ("[T]he term 'vessel subject to the jurisdiction of the United States' includes . . . a vessel in the customs waters of the United States . . . .").  It is undisputed that the incident here occurred well within twelve miles of the coast of Mona Island, which is United States territory.  We express no opinion about whether it was proper to submit the "jurisdictional" issue to the jury.  Cf. 46 U.S.C. § 70504(a) (providing that "[j]urisdictional issues arising under [the Maritime Drug Law Enforcement Act] are preliminary questions of law to be determined solely by the trial judge").  Any error in so doing was harmless.  See United States v. Bravo, 489 F.3d 1, 8 (1st Cir. 2007).

### 1. Santana-Pérez

Santana-Pérez challenges only the finding that he had the requisite mens rea. He contends that he could be convicted only on proof that he was aware of and understood the Coast Guard's orders. We agree. The statute penalizes those who "knowingly" disobey an order to heave-to, a term that ordinarily goes to the defendant's "knowledge of the facts that constitute the offense." Bryan v. United States, 524 U.S. 184, 193 (1998). The issuance of an order to heave-to is one of the facts constituting the offense in this case. To prove that a defendant knew that an order to heave-to was given, it will typically be necessary to prove that he was aware of the order and comprehended its essential message.

Santana-Pérez points to Carpio-Pouret's trial testimony in support of his argument that he lacked the necessary knowledge. Carpio-Pouret testified that he and Santana-Pérez saw the Matinicus's spotlight but did not hear the orders to stop. In addition, both Santana-Pérez and Carpio-Pouret denied hearing the orders in post-arrest statements given to an immigration official.

However, the jury heard substantial testimony undermining the defendants' story. Levecque testified that when he and the crew "lit [the defendants] up with a spotlight and started blowing our horn, they kind of turned and obviously looked -- looked behind them. I'm sure -- they looked very surprised." There was testimony that the order to stop was given in Spanish and English

over the loud hailer, which was audible at a distance of 100 to 200 feet, and that the defendants' vessel was less than 150 feet from the Matinicus at the time. Further testimony established that the boarding crew repeated the order to stop during its first two passes, which brought the crew within 15 to 25 feet of the defendants' vessel, and that the defendants stopped only when they were warned that force would be used.

In addition, Santana-Pérez acknowledged in a post-arrest statement that he saw the "flashing lights" and admitted: "We were . . . spotted by the Coast Guard and I tried to outrun them." He acknowledged having been detained on previous occasions (as did Carpio-Pouret) and stated that he did not stop because he "was scared and did not want to go to jail." Finally, when Carpio-Pouret was asked, "When you saw the Coast Guard boat what happened?" he responded, "I told [Santana-Pérez] that they were coming." Viewed as a whole, the evidence was more than sufficient for the jury to find that Santana-Pérez heard and understood the orders to stop.

## 2. Carpio-Pouret

Carpio-Pouret moved for a judgment of acquittal in the district court on the ground that there was no evidence that he was the "master, operator, or person in charge" of the small vessel. 18 U.S.C. § 2237(a)(1). The district court denied that motion, and Carpio-Pouret properly appealed. In this court, however, Carpio-

Pouret's attorney filed a motion to voluntarily dismiss the appeal. The attorney stated that he had lost contact with Carpio-Pouret, who apparently returned to the Dominican Republic after completing his sentence. We denied the motion because the attorney had not shown that Carpio-Pouret "affirmatively authorized the withdrawal of his direct criminal appeal." The attorney then filed a motion to adopt two of the arguments made in Santana-Pérez's appellate brief: the sufficiency of the evidence argument, discussed above, and an argument relating to the district court's aggressive questioning of witnesses during trial, discussed below. See Fed. R. App. P. 28(i). No separate appellate brief was filed on Carpio-Pouret's behalf.

The rule in this circuit is clear: "[a]doption by reference . . . cannot occur in a vacuum; to be meaningful, the arguments adopted must be readily transferrable from the proponent's case to the adopter's case." United States v. David, 940 F.2d 722, 737 (1st Cir. 1991). Santana-Pérez's argument relating to the district judge's questioning of witnesses is readily transferable to Carpio-Pouret's case. As noted, we address that argument below. It is less clear how Santana-Pérez's sufficiency of the evidence argument might be transferred to Carpio-Pouret's case. To the extent that Carpio-Pouret means to argue that he did not hear the order to heave-to, his argument fails for essentially the reasons discussed above. There was

-9-

sufficient circumstantial evidence for the jury to find that both defendants heard the order and knowingly disobeyed it.

Other arguments that Carpio-Pouret might have been able to make on his own are forfeited. They would be unavailing in any event. The argument that Carpio-Pouret made to the district court -- that he was not the "master, operator, or person in charge" of the small vessel -- was beside the point because the government's theory was that Carpio-Pouret aided and abetted Santana-Pérez's failure to heave-to. And the jury could reasonably have interpreted Carpio-Pouret's warning to Santana-Pérez that the Coast Guard was coming as the sort of encouragement that makes one an aider and abettor (as in, "They're coming, let's get out of here!"). See United States v. Mercado, 610 F.3d 841, 846 (3d Cir. 2010) ("One can aid or abet another through use of words or actions to promote the success of the illegal venture."). The district court did not err in denying Carpio-Pouret's motion for judgment of acquittal.

## B. Evidence of Prior Conviction

The district court ruled in limine that evidence of Santana-Pérez's prior drug conviction could be admitted to impeach him under Federal Rule of Evidence 609(a) if he chose to testify. Although Santana-Pérez challenges that ruling on appeal, he does so only to preserve the issue for Supreme Court review. He concedes that his claim is foreclosed under the Supreme Court's decision in

<u>Luce</u> v. <u>United States</u>, 469 U.S. 38 (1984), which held that "a defendant who chooses not to testify at trial loses his right to appeal the district court's ruling denying his in limine motion to forbid the impeachment use of a prior conviction." <u>United States</u> v. <u>Holmquist</u>, 36 F.3d 154 (1st Cir. 1994).[4]  Santana-Pérez did not testify at trial, and we therefore reject his argument.

## C.  **Vouching**

During closing arguments, the prosecutor rhetorically asked the jury, "Are you going to give [sic] the testimony of the United States Coast Guard officers or are you going to believe the testimony raised by the defendant?"  Santana-Pérez lodged an objection that the government was improperly vouching for its witnesses, which was overruled.

"Improper vouching occurs when the government places the prestige of the United States behind a witness by making personal assurances about the credibility of a witness or implies that the jury should credit the government's evidence simply because the government can be trusted." <u>United States</u> v. <u>Robinson</u>, 473 F.3d 387, 396 (1st Cir. 2007) (internal quotation marks and citation omitted).  Viewed in context, it is clear that the prosecutor's

---

[4]  Santana-Pérez argues that <u>Luce</u> unfairly "forces defendants to either take the stand, be impeached even if wrongly so, and get convicted for the purposes of preserving the error for appeal; or to forgo the option of telling their story to the jury, a fundamental right, only to then insulate a trial court's ruling from review no matter how erroneous it may be."

rhetorical question did neither of those things. The prosecutor had just finished outlining the factors he believed undermined Carpio-Pouret's credibility. He then told the jury, "[t]here's matters of credibility in this case," and rhetorically asked which version of the events the jury would choose to believe. Of course, the implicit message was that the government's case was more believable than the defendants' case. But "merely asking the members of the jury to use their common sense in evaluating the witnesses' testimony" is not improper vouching. United States v. Pérez-Ruiz, 353 F.3d 1, 10 (1st Cir. 2003); see also United States v. Rodríguez, 215 F.3d 110, 123 (1st Cir. 2000) ("[A]n argument that does no more than assert reasons why a witness ought to be accepted as truthful by the jury is not improper witness vouching."); 6 Wayne R. LaFave et al., Criminal Procedure § 24.7(e) (3d ed. 2009) ("[T]he prosecutor is not prohibited from explaining to the jury why it should conclude the defendant was guilty or accept or reject a particular witness' testimony.").

The defendants argue that the prosecutor's "tone and inflection" suggested to the jury that the Coast Guard witnesses should be believed "simply because they are Coast Guard officers." We take that to mean that the prosecutor placed special emphasis on the words "United States Coast Guard officers." If that is true, it might be troubling because such emphasis could be taken to "impl[y] that the jury should credit the government's evidence

simply because the government can be trusted." <u>Robinson</u>, 473 F.3d at 396 (internal quotation marks omitted). But we have no way to judge the accuracy of the defendants' characterization from the trial transcript. On this record, we must necessarily defer to the district court's on-the-spot assessment of that issue. <u>Cf.</u> <u>Reagan</u> v. <u>Brock</u>, 628 F.2d 721, 723 (1st Cir. 1980) (noting that "our ability to comprehend how [a] question was understood in the courtroom is vastly inferior to the district judge's" because the judge "hears the question with counsel's inflection, perceives the length and character of the pause between question and answer, and rules on the party's objection within the context of prior questioning and strategies").

## D. Adverse Inference Instruction

Chief Warrant Officer Levecque testified that the <u>Matinicus</u>'s radar equipment was supposed to have recorded a video of the chase. For technical reasons, however, the video did not record properly and could not be played. The government made a number of efforts to play the video, including bringing it back to the <u>Matinicus</u> to play it on the cutter's recording system. When none of those efforts worked, the government notified the defendants of the technical problem, one month before the trial began.

At trial, the defendants asked the district court to give what they call a missing evidence instruction, which would have

advised the jury that it could infer that the video would have been unfavorable to the government based on the government's failure to produce it. The district court refused to give the instruction, citing the lack of evidence that the government acted in bad faith and the impossibility of producing the video. It told the defendants they could argue to the jury that the government should have produced the video. The defendants challenge that ruling on appeal. We review for abuse of discretion. United States v. Rose, 104 F.3d 1408, 1417 (1st Cir. 1997).

In some circumstances, a party's failure to produce evidence may justify an inference that the evidence would have been unfavorable to the non-producing party.[5] This general rule of evidence encompasses everything from the decision not to call a witness to the intentional destruction of documents. The party seeking the instruction has the burden of laying an appropriate evidentiary foundation. United States v. Laurent, 607 F.3d 895, 902 (1st Cir. 2010). Although the particulars of the required showing vary from situation to situation, the basic thrust is always the same: the circumstances must be such that a reasonable jury could conclude that the evidence in question was unfavorable to the non-producing party. See Laurent, 607 F.3d at 902

---

[5] This question is distinct from the question of whether the government's failure to preserve or produce evidence resulted in a denial of due process, see, e.g., Illinois v. Fisher, 540 U.S. 544 (2004) (per curiam), which is not raised in this appeal.

-14-

(spoliation); <u>United States</u> v. <u>Myerson</u>, 18 F.3d 153, 159 (2d Cir. 1994) (missing witness).

In this case, there is no basis for such an inference. The government gave a satisfactory explanation for its failure to produce the radar video: the video did not properly record because of a technical mishap. Defendants have placed nothing in the record to suggest that the government's explanation was untrue. Under the circumstances, there is no reason to suppose that the video might have been unfavorable to the government. The district court did not abuse its discretion in refusing to give an adverse inference instruction.

**E.  Questioning by the District Court**

Defendants claim that the district court engaged in questioning of Carpio-Pouret on the witness stand that was overly aggressive and signaled to the jury that the judge disbelieved Carpio-Pouret's testimony. There was no objection at trial, <u>see</u> Fed. R. Evid. 614(c), so we review for plain error only. <u>United States</u> v. <u>Paz Uribe</u>, 891 F.2d 396, 400 (1st Cir. 1989).

The principles governing the defendants' claim are easily stated, if less easily applied. It is well-settled that the district court is more than a "mere moderator" in a federal jury trial. <u>Quercia</u> v. <u>United States</u>, 289 U.S. 466, 469 (1933). Among other things, the court has "the prerogative, and at times the duty, of eliciting facts he deems necessary to the clear

-15-

presentation of issues." Paz Uribe, 891 F.2d at 400 (quoting Llach v. United States, 739 F.2d 1322, 1329-30 (8th Cir. 1984)); see also Fed. R. Evid. 614(b) ("The court may interrogate witnesses, whether called by itself or by a party."). The trial court's discretion in this area is broad, and there are many different situations in which judicial interrogation can be warranted. See 29 Charles Alan Wright et al., Federal Practice & Procedure: Evidence § 6235 (1st ed. 1997 & Supp. 2009).

At the same time, the power to interrogate witnesses must be exercised judiciously, particularly when the witness is a defendant in a criminal case. United States v. Melendez-Rivas, 566 F.3d 41, 50 (1st Cir. 2009). Each intervention raises the possibility that the jury will perceive the court as biased toward one party or another. The court must therefore take pains to "preserve[] an attitude of impartiality and guard[] against giving the jury an impression that the court believes the defendant is guilty." Paz Uribe, 891 F.2d at 400-01 (quoting Llach, 739 F.2d at 1329-30).

In this case, the district court aggressively questioned witnesses on both sides. However, the court's questioning of Carpio-Pouret differed in tenor from his questioning of the government's witnesses. Whereas the questions directed at the government's witnesses by and large related to technical matters, many of the questions directed at Carpio-Pouret focused on

perceived gaps and inconsistencies in his story.  An excerpt in which the court pressed Carpio-Pouret to explain how he ended up near Mona Island during a fishing trip will illustrate the general tone of the questioning:

> THE COURT:  And how far from the coastline were the [fishing] traps?
>
> DEFENDANT:  Well, I can't tell you how far away those traps were because, as I stated earlier, I don't know about measurements out at sea.
>
> [. . .]
>
> THE COURT:  How long have you been fishing?
>
> DEFENDANT:  All my life.
>
> THE COURT:  And you can't tell distances in the sea?  You can't tell me those traps were ten, 15 miles offshore?
>
> DEFENDANT:  No, I can't say.
>
> [. . .]
>
> THE COURT:  All right.  And when your motor stopped working, were you near the other fishermen?
>
> DEFENDANT:  Not that close.  We were barely able to see them.
>
> THE COURT:  Why didn't you communicate with them?
>
> DEFENDANT:  We didn't have any instruments to communicate with them.  We tried to signal them with our shirts, but we were unsuccessful at that.
>
> [. . .]

```
THE COURT:     When you dropped off the gas, the
               motor was still operating?

DEFENDANT:     That is correct.

THE COURT:     And then you turned around and
               headed towards the Dominican
               Republic to get the traps; is that
               correct?

DEFENDANT:     Well, no, sir.  We headed somewhat
               parallel to -- I don't know.  But
               we headed -- well, we headed
               southeast.  I don't know, maybe it
               was that.   I don't know what
               bearing we took.

               [. . .]

THE COURT:     And that was a course that was not
               taking you to the Dominican
               Republic.

DEFENDANT:     No, sir.
```

In our view, this exchange and others like it skirted dangerously close to the line between questioning intended to clear up muddled or gap-filled testimony, which is permissible, and questioning that signals the court's disbelief of the witness, which is not.  See United States v. Tilghman, 134 F.3d 414, 416 (D.C. Cir. 1998).  The question about distances at sea, in particular, implies that the court was having trouble believing Carpio-Pouret's story.

In the end, however, the error, if any, was not plain. Despite the tenor of the questions, they appear to have been aimed at clarifying Carpio-Pouret's testimony -- a legitimate goal.  See United States v. Filani, 74 F.3d 378, 386 (2d Cir. 1996); United

-18-

States v. <u>Hickman</u>, 592 F.2d 931, 933 (6th Cir. 1979). Carpio-Pouret gave only a vague explanation on direct examination and cross-examination of what he and Santana-Pérez were doing between the morning of March 14, 2008, when they left to go fishing, and the morning of March 15, when they encountered the <u>Matinicus</u>. The district court could reasonably have concluded that the jury would benefit from a fuller account of the day's events. Also, any signals the court may have given about its views are susceptible of multiple interpretations on the cold record. We therefore cannot say that any error was "clear" or "obvious." <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 734 (1993). We also note that the district court instructed the jury not to "assume from anything [it] may have said that [it had] any opinion concerning the issues in this case." The defendants are not entitled to a new trial.

**AFFIRMED**.