**UNITED STATES of America, Appellee,**

v.

**Walter HARVEY, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Raphael CLARK, Appellant.**

Nos. 83–1824, 83–1825.

United States Court of Appeals,
Eighth Circuit.

Submitted May 14, 1984.

Decided March 5, 1985.

---

**3.** The able District Judge sat as a member of this Court in *St. Joseph*. He knows as much about what that opinion means as we do.

Robert C. Babione, St. Louis, Mo., for Harvey.

David W. Harlan, St. Louis, Mo., for Clark.

Henry J. Fredericks, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before McMILLIAN, Circuit Judge, BENNETT,[*] Circuit Judge, and ARNOLD, Circuit Judge.

McMILLIAN, Circuit Judge.

Walter Harvey and Raphael Clark appeal from a final judgment entered in the District Court[1] for the Eastern District of Missouri after a jury verdict finding each of them guilty of kidnapping, in violation of 18 U.S.C. § 1201, transportation of a stolen vehicle across state lines, in violation of 18 U.S.C. § 2312, interstate transportation of a female for immoral purposes, in violation of 18 U.S.C. § 2421, and unlawful use of a firearm, in violation of 18 U.S.C. § 924(c)(1). For kidnapping (Count I), each appellant was sentenced to one hundred years imprisonment. For transporting a stolen vehicle (Count II), each appellant was sentenced to five years to run consecutively with Count I. For transporting a woman in interstate commerce for immoral purposes (Count III), each appellant was sentenced to five years to run consecutively with Counts I and II. Finally, for unlawful use of a firearm (Count IV), each appellant was sentenced to ten years, to run consecutively with the other counts, for a total sentence of one hundred and twenty years imprisonment. For reversal appellants argue that the district court erred in (1) denying appellants' motion for a change of venue, (2) limiting voir dire to determine the prejudicial effect of extensive pretrial publicity and racial bias, (3) refusing to disclose the names and addresses of the persons on the master grand jury list, (4) denying appellants' request for a lineup and permitting the government to rebut improperly the defense theory that appellants were not the abductors, (5) admitting hypnotically enhanced testimony, (6) instructing improperly the jury on the unlawful use of a firearm, and (7) refusing to declare a mistrial because of prosecutorial misconduct. For the reasons discussed below, we affirm the convictions.

The facts can be summarized as follows, keeping in mind that the evidence must be construed in the light most favorable to the jury verdict. *See Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). On December 14, 1982, Gary and Donna Decker went Christmas shopping at a department store in north St. Louis County, Missouri. Inside the store they purchased, among other things, an umbrella, some children's toys and some tobacco. Upon exiting the store, appellants confronted the Deckers, forced them into the Deckers' automobile, a 1975 Chevrolet Nova, and instructed them to drive out of the parking lot.

Lonnell Jamieson, also in the same parking lot, overheard Donna Decker ask the strangers not to hurt her. Becoming suspicious because of what he had heard, Jamieson followed the Deckers' car out of the parking lot and saw the automobile head north on Highway 367. Jamieson wrote down the first three letters of the Nova's license, and returned to the shopping mall and reported the incident to the security guards on duty.

---

* The Honorable Marion T. Bennett, Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

1. The Honorable H. Kenneth Wangelin, United States Senior District Judge for the Eastern and Western Districts of Missouri.

Harvey drove the Deckers' Nova east toward Illinois, via the Poplar Street Bridge. Gary Decker and Clark struggled in the back seat and Clark shot Decker in the chest with a .32 caliber revolver.

At approximately 10:05 p.m., the Nova stopped at a red light at the intersection of Eighth and Spruce Streets in downtown St. Louis, Missouri. Vandy Brewer, who was driving home from work, was stopped at the same intersection adjacent to a dark blue Chevrolet Nova. Brewer testified that she saw a black man driving the car, a white woman sitting in the front seat, another black man sitting behind the driver, and a white man sitting on the passenger side of the back seat. Brewer testified that the woman in the Nova looked directly at her. After the signal changed, the Nova drove up the ramp onto the Poplar Street Bridge.

Just east of the Interstate Highway 55 entrance onto the Poplar Street Bridge, the Deckers' Nova was stopped along the south curb of the bridge under a light. Debbie Geiger was driving her jeep eastward on the bridge and, because of traffic congestion, was forced to stop immediately adjacent to the parked Nova. As Geiger looked into the Nova, she saw a woman she identified as Donna Decker sitting in the front seat between Harvey and Clark. Clark was driving. In the back seat she saw a white man slumped against the passenger side door. Geiger testified that the woman in the Nova had a very frightened look on her face. Geiger later identified Harvey and Clark in separate lineups and in court before the jury.

While the car was on the bridge, some of Gary Decker's personal possessions, such as his driver's license, checking account card and hospital physician's card, were thrown out of the car. The police later recovered these items underneath the bridge on Poplar Street.

Clark then drove the Deckers' car to a deserted area of East St. Louis, Illinois. Harvey and Clark got out of the car and forced Donna Decker to have sexual relations with them. Afterwards, while Donna Decker lay on the ground, she was shot four times in the head and face with a .32 caliber revolver. Appellants also placed Gary Decker on the ground near his wife. Appellants took Donna Decker's wedding ring, watch and purse.

Harvey and Clark then drove back to St. Louis, Missouri, to the home of Essie Carter and her sons Cedric and Farland Gilliehan. Harvey and Clark brought in a bag from the department store at which the Deckers were shopping. The bag contained an umbrella, children's toys and tobacco. Harvey showed Cedric Gilliehan his gun and told him that he and Clark had just robbed someone.

Upon Harvey and Clark's request, Cedric Gilliehan removed the radio and speakers from the Nova, while Clark wiped the inside and outside of the Nova with a rag. Harvey opened the trunk of the Nova, where he found some photographs of Donna Decker and her son. Harvey threw these pictures into a nearby sewer. Harvey and Clark also removed the spare tire and the jack from the Nova.

Harvey and Clark retrieved the department store items from Essie Carter's home and made arrangements with Cedric Gilliehan to get rid of the Deckers' car. Cedric and Harvey drove in Cedric's Thunderbird, while Clark followed driving the Nova. They drove south on Goodfellow Boulevard, arriving at the Job Corps Center near Goodfellow and Stratford. The Thunderbird and the Nova collided as they turned onto Stratford, causing paint and body damage to both automobiles. Clark parked the Nova on Stratford and left it there overnight. The next day Clark drove the Nova to Laurel Street in north St. Louis. Clark took three other men, Maurice Taylor, Jeff Browley and Steve Robinson, to Laurel Street to show them the Nova. The Nova then was moved several blocks next to a vacant lot on Minerva. Taylor removed the battery from the Nova and put it in the trunk of Robinson's Oldsmobile. The four men then went back to Taylor's house. There was some conversation concerning the Decker incident. On January

8, 1983, Clark also told Keith Voss about the robbery and shooting of the Deckers.

Donna and Gary Decker were found in a muddy field in East St. Louis, Illinois. Donna Decker, nude below the waist, had been shot four times in the head and face. A saliva specimen from Donna Decker's mouth contained male spermatozoa; vaginal and rectal swabs taken from Donna Decker contained the same. Gary Decker was found several feet away from his wife. Investigators removed a shopping list, naming such items as tobacco, an umbrella and a child's pull-a-truck toy, from Gary Decker's clothing.

Cedric Gilliehan led the FBI to Minnie and Wilborn streets where the photographs of Donna Decker and her son, her purse, and other debris were recovered from the sewer.

This crime received tremendous pretrial publicity in the metropolitan St. Louis area. Appellants filed a motion for a change of venue, but the motion was denied. Appellants were convicted by an all white jury in April 1983. The government's case was based on eyewitness identifications of appellants and testimony concerning admissions made to several persons by appellants.

*Venue*

■■■ Appellants argue that the district court erred in denying their motion for a change of venue, thus depriving appellants of a fair trial because of the prejudicial effect of the intense pretrial publicity.[2] We disagree.

> Mere exposure to publicity or the formation of tentative impressions by some jurors is not enough to require a change of venue. The ultimate test is whether a juror has been exposed to pre-trial publicity and, if so, whether he or she can set aside any impression or opinion resulting from that exposure and render a verdict

based solely on the evidence presented at trial.

*United States v. Bliss*, 735 F.2d 294, 298 (8th Cir.1984), *citing United States v. Brown*, 540 F.2d 364, 378 (8th Cir.1976); *see also Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961); *United States v. Poludniak*, 657 F.2d 948, 955 (8th Cir.1981), *cert. denied*, 455 U.S. 940, 102 S.Ct. 1431, 71 L.Ed.2d 650 (1982). A pretrial change of venue is necessary when "pretrial publicity was so intensive and extensive or the examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors [regarding their impartiality] and would be compelled to find bias or preformed opinion as a matter of law." *United States v. Bliss*, 735 F.2d at 298, *citing Beck v. Washington*, 369 U.S. 541, 557, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1961). The district court adequately determined during voir dire that the jurors were not so affected by the pretrial publicity in this case that they could not render a fair and impartial decision. We hold that the district court did not abuse its discretion in denying appellants' motion for a change of venue.

*Voir Dire*

A. *Pretrial Publicity*

Appellants argue that the district court erred in limiting the scope and manner of voir dire on the issue of prejudicial impact or pretrial publicity. Appellants argue that voir dire was insufficient to test the impartiality of the individual members of the jury panel.

■■ A district court has broad discretion to conduct voir dire and error exists only if abuse of that discretion resulted in substantial prejudice to the defendant. *United States v. Brown*, 540 F.2d at 378. In the present case the district court took judicial notice of the tremendous publicity surrounding this case.[3] The district court

---

**2.** Appellants do not challenge the district court's decision to defer its ruling on a motion for change of venue until testing the effect of pretrial publicity by examining the jury panel on

voir dire. *United States v. Brown*, 540 F.2d 364, 377–78 (8th Cir.1976).

**3.** Clark argues that the district court improperly rejected an offer of proof regarding the exist-

then asked each of the forty-four members of the jury panel whether they had been exposed to any pretrial publicity about the present case. Only nineteen of the forty-four panel members answered affirmatively. The district court then asked those nineteen panelists *individually* whether they had heard anything that would prejudice them for or against the government or the defendants. The district court also asked each prospective juror whether additional evidence would be necessary to overcome the effect of any publicity that they had encountered. Finally, the district court asked each prospective juror whether he or she could be absolutely fair to both sides if chosen to serve.

█ One member of the panel responded that his exposure to pretrial publicity had prejudiced him, and he was excused by the district court. The other panelists that had been exposed to some pretrial publicity indicated that they had not been influenced by the publicity and that they could be fair if chosen to serve on the jury. As an added safeguard, the district court granted appellants ten additional peremptory challenges, for a total of twenty. After careful examination of the voir dire transcript, we hold that the district court did not abuse its discretion in conducting voir dire and adequately established that there was no significant possibility that the panelists would be ineligible to serve as jurors because of the effects of pretrial publicity, thereby assuring that appellants would receive a fair trial before an impartial jury.

## B. *Racial Prejudice*

Appellants argue that the district court denied them a fair trial by questioning the jury panel as a whole about racial bias, rather than questioning each prospective juror individually. The government argues that appellants failed to preserve this issue for appeal and, alternatively, that the dis-

trict court's questioning of the jury panel as a whole about racial bias was sufficient.

After appellants' motion for individual voir dire examination was denied, appellants did not submit proposed voir dire questions or object to the questions asked by the district court. The district court asked the jury panel as a whole two questions regarding possible racial prejudice against appellants:

THE COURT: The Defendants are black men in this case; the Deckers were white people. Now, is there anybody on this panel who would allow their verdict to be influenced because of the race of the Defendants or the Deckers? If there is anybody on this panel that feels that that situation, a race situation would enter into your deliberations in the slightest fashion, raise your hands right now. And I see no hands raised....

. . . .

THE COURT: Is there anybody on this jury who has had an unpleasant experience with a black person? Well, now, wait a minute. I could ask you if you had had an unpleasant experience with anybody, either white or black. Let me put it this way. Have any of you had an unpleasant experience with a black person which would in any way influence your thinking if you were chosen to serve as a juror? Now if so, please raise your hands. And I see no hands raised.

Following voir dire appellants asked that each venireperson be questioned about racial bias. Appellants' request was denied but the district court noted that there were only three blacks on the prospective jury list. Appellants did not request that additional questions be asked regarding the possibility of racial prejudice affecting the jury panel's impartiality despite ample opportunity to submit proposed voir dire questions. In *United States v. Bear Runner*, 502 F.2d 908 (8th Cir.1974), this court stated:

ence of pretrial publicity. This argument is without merit. As the government notes, at the conclusion of voir dire appellants asked leave to submit evidence of pretrial publicity to the

court, *or, in the alternative,* for the court to take notice of the publicity. The court took notice of the publicity and appellants did not object to the court's action.

There is no doubt that the trial judge has the duty to neutralize the effect of any known area of prejudice. The difficulty here is that the defendant did not submit any additional questions nor did his counsel seek leave to interrogate the jurors on the matter of publicity. It is fundamental that a defendant may not assert as error on appeal matters not complained of at trial.

*Id.* at 910 (citations omitted).

In the present case the district court asked the jury panel as a whole questions about racial bias. Appellants argue that a more probing inquiry was necessary to insure their right to a fair trial, but they failed to submit additional questions on racial prejudice to the district court.

█ Assuming arguendo that appellants have preserved this issue for appeal, we disagree that the district court in this case was obligated to question each venireperson individually regarding possible racial prejudice. As the Supreme Court stated in *Rosales-Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (*Rosales-Lopez*):

> *Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts.
>
> Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions. In neither instance can an appellate court easily second-guess the conclusion of the decision-maker who heard and observed the witnesses.
>
> Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire.*

*Id.* at 188–89, 101 S.Ct. at 1634–35 (citations and footnotes omitted); *see also Llach v. United States,* 739 F.2d 1322, 1332–33 (8th Cir.1984).

In *Rosales-Lopez* the district court refused to ask the prospective jurors *any* questions concerning ethnic or racial prejudice. In the present case the district court specifically inquired about prospective jurors' possible racial prejudice. *Rosales-Lopez* does not require a district court to question each venireperson individually on the subject of racial prejudice, even if the case involves a violent, interracial crime. *Rosales-Lopez,* 451 U.S. at 185, 101 S.Ct. at 1632. We hold, therefore, that the district court adequately questioned the jurors about racial prejudice and did not abuse its discretion in refusing to question the prospective jurors individually.

### Master Grand Jury List

█ Appellants argue that the district court erred in refusing to disclose the names and addresses of the persons on the master grand jury list, thereby depriving appellants of the ability to determine whether the master grand jury list represented a racial and economic cross-section of the community. The government argues that appellants abandoned their right to object to the composition of the grand jury by choosing not to pursue the information in connection with the jury selection process provided by the district court's order and by failing to prove that the racial and economic information they sought was unavailable to them in the absence of the requested names and addresses. We agree with the government.

The Jury Selection and Service Act, as amended in 1968, 28 U.S.C. § 1867(f), provides in part (emphasis added):

The contents of records or papers used by the jury commission or clerk in connection with the jury selection process shall not be disclosed, except ... as may be necessary in the preparation or presentation of a motion [challenging compliance with selection procedures] under ... this section.... *The parties in a case shall be allowed to inspect, reproduce, and copy such records or papers at all reasonable times during the preparation and pendency of such a motion.*

In *Test v. United States,* 420 U.S. 28, 30, 95 S.Ct. 749, 750, 42 L.Ed.2d 786 (1975) (footnotes omitted; emphasis in original), the Supreme Court stated that "[t]his provision makes clear that a litigant has essentially an *unqualified* right to inspect jury lists," so that he or she may evaluate the fairness of the jury selection process. In the present case, however, appellants were not denied an opportunity to inspect the jury lists. The district court ordered that appellants be permitted to inspect data relating to the constituency and method of the grand jury selection, omitting only the names and addresses of the persons on the master grand jury list. Appellants objected to the exclusion of the names and addresses but cited no authority for their position that they were entitled to that particular information. Furthermore, appellants did not examine the records made available to them or depose the person in charge of the grand jury records to determine whether the necessary demographic information could be obtained without the names and addresses of the persons on the grand jury list. In short, appellants did not attempt to ascertain whether they were harmed by the district court's exclusion. We hold, therefore, that appellants abandoned their objection to the district court's decision not to disclose the names and addresses of the persons on the master grand jury list.

### Identification Procedures

Appellants argue that (1) the district court erred in denying their pretrial motion requesting that Maurice Taylor and Cedric and Farland Gilliehan participate in a lineup and (2) the government improperly recalled Debbie Geiger to rebut the defense inference that the Gilliehans and Taylor were the Deckers' abductors and not appellants.

The government argues that the district court did not abuse its discretion in denying appellants' motion for a lineup. The district court denied the motion because there was no evidence that the police considered Gilliehans and Taylor to be suspects and because the government is under no obligation to create potentially exculpatory evidence where none exists. *United States v. Clark,* No. 83–11CR(1), slip op. at 7 (E.D.Mo. Mar. 17, 1983) (order approving magistrate's review and recommendation).

A district court has the discretion to grant a defendant's motion for a lineup, *see United States v. Caldwell,* 465 F.2d 669, 671 (D.C.Cir.1972) (citations omitted), but, as the district court correctly noted, the government is not required to create exculpatory evidence that does not exist. *United States v. Sukumolachan,* 610 F.2d 685, 687 (9th Cir.1980) (per curiam). Debbie Geiger, based on her observations during the time her car was stopped adjacent to the Deckers' car on the Poplar Street Bridge, identified each appellant in two separate lineups. Appellants requested that Geiger and other witnesses viewing lineups be ordered to view lineups containing Taylor and the Gilliehans to insure that the identification of appellants was reliable. Appellants do not argue, however, that the lineups viewed by the witnesses were impermissibly suggestive. *See Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). We hold, therefore, that the district court did not abuse its discretion in denying appellants' motion requesting that the government conduct a lineup containing Taylor and the Gilliehans.

The government also argues that the district court did not abuse its discretion in permitting the government to recall Debbie Geiger to testify that she had never seen

Taylor and the Gilliehans before she saw them in court. We agree.

■ After Geiger testified, the government called Cedric Gilliehan, Farland Gilliehan and Maurice Taylor. On cross-examination, defense counsel suggested that these men, and not appellants, were the Deckers' abductors. In anticipation of this defense, the government kept Geiger apart from Taylor and the Gilliehans. After the Gilliehans and Taylor had testified and were cross-examined, the government recalled Geiger. Taylor and the Gilliehans were brought before Geiger in court and she was asked whether she had "seen any of these three men before in your life?" Geiger responded that she had not. Appellants cite no authority in support of their position that this procedure was impermissible. We hold that the district court did not abuse its discretion in permitting the government to rebut the inferences raised by the cross-examination of the Gilliehans and Taylor.

*Hypnotically Enhanced Testimony*

Appellants argue that the district court erred in permitting Lonnell Jamieson and Vandy Brewer to testify about matters that they recalled after undergoing hypnosis.

Lonnell Jamieson testified that he went to the police after he saw the Deckers abducted on the department store parking lot. He testified that at that time he gave the police a three-page, signed statement of his observations. On December 28, 1982, Jamieson consented to hypnosis by Dr. Lum as requested by the Illinois Division of Criminal Investigation. After hypnosis Jamieson did not recall any additional facts concerning the Deckers' abduction. Before his hypnotism, Jamieson viewed one lineup, but was unable to identify anyone. After hypnosis Jamieson viewed two lineups. In the first lineup Jamieson did identify Maurice Taylor, but failed to identify Clark. In the second lineup Jamieson identified Harvey and an unknown male, indicating that one of them might be one of the men he saw in the department store parking lot.

Appellants concede that Jamieson's testimony was not enhanced by hypnosis.

Vandy Brewer testified that before she was hypnotized she told the police that on December 14, 1982, at approximately 10 p.m., she recalled stopping next to a dark Nova in which a black man and a white woman were seated in the front seat and a black man and a white man were seated in the back seat. She recalled that the white woman looked directly at her. She also told the police that she saw the dark Nova go up the ramp onto the Poplar Street Bridge. She recalled that the Nova's license plate had three letters and three numbers but could not recall what they were.

On December 28, 1982, Brewer submitted to hypnosis by Dr. Lum in the presence of an officer of the Illinois Division of Criminal Investigation. At trial Brewer testified that during hypnosis she recited a license plate number—JPB 183. The license plate number of the Deckers' Nova was actually JPB 836. Brewer testified that after hypnosis she was shown a photograph of Donna Decker and that she told the police that the woman in the photograph looked similar to the woman she had seen in the dark Nova.

Prior to the admission of the testimony, the district court conducted a hearing outside the presence of the jury. Brewer and Jamieson testified about the hypnosis procedure utilized by Dr. Lum. The district court viewed the videotape of Brewer's responses while under hypnosis. Because Jamieson's original statement was not enhanced by hypnosis, the district court chose not to view the videotape of Jamieson's hypnosis session. After viewing the videotape of Brewer's hypnosis session, the district court concluded that the interrogator during hypnosis did not lead or suggest answers to Jamieson or Brewer and thus permitted Jamieson and Brewer to testify about the effect of hypnosis on their recollection.

■ Whether hypnotically enhanced testimony is admissible is a question of

first impression for this court. The government urges that we accept the Ninth Circuit's position that pretrial hypnosis of witnesses is admissible, arguing that the fact of hypnosis affects the credibility and not admissibility of testimony. *See United States v. Awkard*, 597 F.2d 667, 669 (9th Cir.), *cert. denied*, 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979). Alternatively, the government argues that even if it was admitted erroneously, Jamieson's and Brewer's testimony concerning their post-hypnotic recollections was harmless. Subject to procedural safeguards ensuring that post-hypnotic statements are truly the witness' own recollections, the Ninth Circuit permits admission of hypnotically refreshed recollection in criminal and civil cases. *See United States v. Awkard*, 597 F.2d at 669; *United States v. Adams*, 581 F.2d 193, 198–99 & n. 12 (9th Cir.), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *Kline v. Ford Motor Co.*, 523 F.2d 1067, 1069–70 (9th Cir.1975). The Fifth Circuit recently stated that "[i]f a sufficiently reliable method exists for the witness to separate pre-hypnotic memory from post-hypnotic pseudo-memory, such testimony may be admissible." *United States v. Valdez*, 722 F.2d 1196, 1204 (5th Cir.1984). Similarly, state courts have outlined procedures governing the admissibility of hypnotically refreshed testimony. *See, e.g., State v. Little*, 674 S.W.2d 541 (Mo.1984) (banc); *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981).

However, it is unnecessary for this court to rule on the admissibility of hypnotically refreshed testimony or to decide whether the district court adhered to the necessary procedural safeguards. We hold that, because of the overwhelming evidence of guilt in the present case, substantial rights of appellants were not affected and thus, even if this testimony was erroneously admitted, the error was harmless. *See* Fed. R.Crim.P. 52(a).

*Firearm Instruction*

Appellants argue that the district court's instruction on the use of a firearm to commit the offense of kidnapping improperly directed the jury to find appellants guilty of such offense if they were found guilty of kidnapping. In *Roe v. United States*, 287 F.2d 435, 440 (5th Cir.) (footnote and citations omitted), *cert. denied*, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29 (1961), the court stated that "no fact, not even an undisputed fact, may be determined by the Judge. The plea of not guilty puts all in issue, even the most patent truths. In our federal system, the Trial Court may never instruct a verdict either in whole or in part." The government argues that the questionable portion of the instruction, when read together with the entire instruction on the firearm offense, did not direct the jury to find appellants guilty of the firearm offense.

The district court read to the jury the following instruction on the firearm offense:

As to Count IV, it is charged in the indictment that:

On or about December 14, 1982, in the Eastern District of Missouri, RAPHAEL CLARK and WALTER HARVEY, the defendants herein, willfully did use a firearm, that is a .32 caliber revolver, to commit the offense of kidnapping, a felony prosecutable in a court of the United States. In violation of Title 18, United States Code, Section 924(c)(1).

As to Count IV, Title 18, United States Code, Section 924, provides in pertinent part as follows:

Whoever uses a firearm to commit any felony for which he may be prosecuted in any court of the United States shall be guilty of an offense against the United States.

The offense charged in Count IV is a distinct offense from that charged in Count I. If, however, you find the defendant not guilty under Count I, you will also find him not guilty of Count IV. *If you find him guilty of Count I, then you will proceed to consider him guilty of Count IV.*

As to Count IV, the crime of kidnapping in violation of Title 18, United States Code, Section 1201 charged in

Count I of the indictment is a felony for which the defendant may be prosecuted in a United States court.

Under 18 U.S.C.A. 921(a)(3), the term "firearm" includes any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive.

A .32 caliber revolver is a firearm within the meaning of Title 18, U.S. Code Annotated 924(c).

The defendant is considered to have used a firearm if its presence in his possession in any manner facilitated the carrying out of the felony. It is not necessary that the firearm be fired, in order that it may be considered as having been used.

As to Count IV, two essential elements are required to be proved in order to establish the offense charged in Count IV of the indictment, as follows:

First: That the defendant committed a felony for which he might be prosecuted in a United States Court.

Second: That during the commission of the felony the defendant used a firearm.

(Emphasis added.)

Appellants failed to object to this instruction; therefore, we must decide whether the district court's instruction was plain error affecting substantial rights of appellants. *See* Fed.R.Crim.P. 52(b).

■ Although the underscored portion of this instruction is arguably ambiguous, the ambiguity is clarified at the end of the instruction when the jury was told, correctly, that in order to convict it would have to find that defendants used a firearm during the commission of a felony. Because the instruction could have been understood by the jury to require it to make the findings that are mandated by law, the asserted error does not constitute plain error. We hold, therefore, that appellants' conviction for the use of a firearm to commit a kidnapping, 18 U.S.C. § 924(c)(1), must be affirmed.

*Prosecutorial Misconduct*

Appellants argue that several comments made by the government during closing argument prejudiced appellants before the jury in such a manner to deprive them of a fair trial. The government argues that appellants failed to object to some of the comments that are now challenged on appeal and therefore those points cannot be reversed by this court in the absence of plain error. The remaining comments were objected to by appellants, but the district court's decision to overrule the objections, the government argues, was not an abuse of discretion.

Once again we are called upon to review improper statements made by prosecutors during closing arguments. We have repeatedly instructed prosecutors regarding their proper role in the adversary system and the acceptable limits of closing arguments. *See, e.g., United States v. Llach,* 739 F.2d at 1330–31; *United States v. Michaels,* 726 F.2d 1307, 1315 (8th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984); *United States v. Auerbach,* 682 F.2d 735, 739–40 (8th Cir.), *cert. denied,* 459 U.S. 911, 103 S.Ct. 219, 74 L.Ed.2d 174 (1982); *United States v. Singer,* 660 F.2d 1295, 1305 (8th Cir.1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982); *United States v. Segal,* 649 F.2d 599, 604 (8th Cir.1981); *United States v. Bohr,* 581 F.2d 1294, 1301 (8th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978).

■ However, the district court is vested with broad discretion in controlling closing arguments. *United States v. Llach,* 739 F.2d at 1330; *United States v. Michaels,* 726 F.2d at 1315. If an arguably improper statement during closing argument is not objected to by the defense, we will only reverse under exceptional circumstances. Fed.R.Crim.P. 52(b). If the prosecutor's statement was objected to, we will not reverse the district court absent a showing of abuse of discretion. We must consider "whether the objectionable comments were so offensive, when considered in the context of the entire trial, as to

deprive [appellants] of a fair trial." *United States v. Llach*, 739 F.2d at 1330 (citation omitted).

At trial the government called Retha Edens, a forensic scientist to testify regarding blood and hair analyses she performed in connection with this case. On direct, she testified that she analyzed Donna Decker's saliva, vaginal fluid and rectal fluid for the presence of blood and semen, both of which were found. On direct Edens did not identify the blood type of the blood found in Donna Decker's samples, nor did the government ask Edens whether the samples were consistent with appellants' blood type. On cross-examination appellants attempted to determine whether the blood tests performed by Edens conclusively connected appellants to the crime. Edens' testimony did not definitely establish appellants' participation nor did the tests rule out their involvement.[4]

In its closing argument, the government made several references to Edens' testimony:

[Prosecuting Attorney]: ... Now the blood samples that they got, according to

the scientist who came in here to testify, said that blood can be broken down into four types, the ABO type: A, B, AB, and O. It turned out that the semen found on Donna Decker in her mouth and in her vagina and anus could be typed as O. [Defense Attorney]: Objection, that is a misstatement of the evidence. It was typed as A, the semen that was found, it was not typed as O.

THE COURT: Ladies and gentlemen, you heard the testimony, you be guided by what you heard. Proceed.

[Prosecuting Attorney]: It was typed as O. The semen. A was the type that Donna Decker had.

[Defense attorney]: I object again. There is no evidence of that. And for the record—

THE COURT: Same comment. Proceed.

Pardon me just a minute. Ladies and gentlemen of the jury, arguments of counsel are not evidence. You may be guided by what you heard the evidence to be. Now let's proceed.

[Prosecuting Attorney]: Gary Decker has O, Maurice Taylor had O, Defendant

---

4. The following is excerpted from the cross-examination of Retha Edens.

Q. Okay. And these two individuals [Harvey and Clark] had the ABO type of O according to the standard that you obtained?
A. That's true.
Q. Okay.... [W]ere you able to determine if they were both what we call secreters?
A. Yes, they were both secreters.
Q. In other words, does that mean that the type of blood that they had, this type O, it would show up in their saliva and in their semen?
A. Yes.
Q. Okay. And there are tests that were performed at your laboratory to confirm that they were secreters; is that correct?
A. That's true.
Q. And the blood test, that was also confirmed at your laboratory?
A. Yes.
Q. Now the seminal material that you examined, let's first start off with the gauze or whatever type of sample you got from the mouth area. You did identify seminal material there; is that correct?
A. That's right.
Q. Okay. What was the ABO type or the blood type that you were able to detect from the semen?

A. From the sample. I can't say whether it was from the semen or from the blood. It was a mixture of blood, saliva, and semen, because it was taken from her mouth. But the type was A and H activity....
Q. Okay. My question was this, though, in other words you examined seminal material. The blood type on the seminal material that you examined was what?
A. A and H activity from the saliva sample.
Q. Okay. You examined the two swabs from the vaginal and rectal area. You found seminal material there also; is that correct?
A. Yes, I did.
Q. Okay. And what was the ABO type that you observed from those two samples?
A. Okay. Again, on each of these samples from the vaginal swab and from the rectal swab there was A and H activity.
Q. Okay. So would it be fair to assume from what you have told us that the three areas that you analyzed, that each of those three areas in your analysis resulted in the same conclusion as far as the blood type that you are able to produce?
A. Yes, they are all three A and H activity.
Q. A and H activity; is that correct?
A. That's true.

Clark had O, Defendant Harvey had O. So typing the blood didn't put any one particular individual as depositing that semen on Donna Decker. But what did it do? It excluded the A's, the B's, and the AB's; and said that whoever did it had to be an O....

....

[Prosecuting Attorney]: ... One of the things I want to point out and recall to your mind and to your memory from the testimony of Retha Edens is the blood typing of the various individuals involved. She was very specific in typing the bloods of Donna Decker, Walter Harvey, Raphael Clark, and Gary Decker, in addition to Maurice Taylor. Out of that entire group, only one was an A and that was Donna Decker. The balance of them—

[Defense Attorney]: Could we approach the bench, Your Honor?

THE COURT: No. Well, yes, come on. (The following occurred at the bench outside the hearing of the jury.)

[Defense Attorney]: Your Honor, I'm going to object. That last statement goes beyond any comments, that there's absolutely no testimony what Donna Decker's blood type was or what Maurice Taylor's blood type was....

....

(The following occurred within the hearing of the jury.):

THE COURT: Ladies and gentlemen, as to what the testimony was, you heard the testimony, you are the sole judges as to what the testimony was. You may proceed.

[Prosecuting Attorney]: The blood type of Donna Decker was Type A and all the rest of them were O. And the semen found in the mouth of Donna Decker, and the semen found in her vagina, and the semen found in her rectal area was typed as O. It did not particularly pinpoint any particular individual, it simply showed that the ones that were examined, Taylor, Harvey, Clark and even Gary, were not excluded in the semen

that was found, that they were not excluded....

The prosecutor inadvertently misstated the evidence; however, the district court promptly cautioned jurors that it was their duty to independently assess the evidence and that they should not consider closing arguments as evidence in the case. In *United States v. Singer*, 660 F.2d at 1305, in its closing argument the government inaccurately repeated statements supposedly made by a witness. We warned that the government "must carefully review the accuracy of statements ... before attributing them to a particular witness." *Id.* Nonetheless, in *United States v. Singer*, we noted that, as in the present case, the district court immediately cautioned the jury to recall the actual testimony of the witness and that closing arguments were not evidence in the case and held that the district court did not abuse its discretion in denying the motion for a mistrial. *Id.* The evidence in this case was not insubstantial; thus when viewed in light of the entire trial, we hold that these remarks do not constitute reversible error and the district court did not abuse its discretion in denying appellants' motion for a mistrial.

Appellants also argue that the district court erred in overruling their objection to the government's reference to the effects of marijuana mixed with another drug. There was some testimony regarding the use of drugs in this case and thus we hold that the district court did not abuse its discretion in determining that this comment was not objectionable.

Finally, appellants argue that several remarks made by the government during closing argument were plain error. First, the government theorized that the evidence showed that Clark jumped from the back seat of the Deckers' car to the front seat and Harvey moved from the driver's seat to the passenger's seat sometime before they drove onto the Poplar Street Bridge. The government argues that this was a reasonable inference from the evidence.

Appellants also argue that the government improperly inferred that appellants were under the influence of drugs on the night of the crime. The government argues that the use of strong narcotics would explain the brutal and irrational nature of the crime and thus the comment was a reasonable inference from the evidence.

Finally, appellants argue that the government improperly attributed the use of a racial epithet ("honky") to Clark, that this word was especially inflammatory and prejudicial because this case involved a violent interracial crime.

These comments were not objected to by appellants. The district court, in its general instructions to the jury, carefully cautioned the jury that the attorneys' arguments were not evidence and that they should consider only the evidence in arriving at their verdict. *See United States v. Llach,* 739 F.2d at 1330. When viewed in light of the entire trial, we hold that the prosecutor's remarks did not constitute plain error. This court cautions the government, however, that

> [t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1934).

Accordingly, the convictions are affirmed.