UNITED STATES of America, Appellee,

v.

Spencer SEGAL, Appellant.

No. 80–1898.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 11, 1981.

Decided May 21, 1981.

Thomas H. Jensen, Foster & Jensen, Minneapolis, Minn., for appellant.

Thomas K. Berg, U. S. Atty., James A. Morrow, Asst. U. S. Atty., D. Minnesota, Minneapolis, Minn., for appellee.

Before ROSS, HENLEY and McMILLIAN, Circuit Judges.

McMILLIAN, Circuit Judge.

Spencer Segal appeals from a final judgment entered in the District Court for the District of Minnesota[1] upon a jury verdict finding him guilty of endeavoring to obstruct a federal criminal investigation in violation of 18 U.S.C. § 1510 (count IV), aiding and abetting the making of false entries in bank statements in violation of 18 U.S.C. §§ 2, 1005 (counts V, XIV), and making materially false statements in loan applications in violation of 18 U.S.C. § 1014 (counts VII, IX, XV, XVI). The district court sentenced appellant to a total of six years imprisonment.[2]

For reversal appellant argues that (1) the evidence was insufficient to sustain the verdicts, (2) the government attorney's closing argument was so prejudicial as to deprive him of a fair trial, and (3) the case should be remanded for an inquiry into the circumstances of the plea agreement between the government and key government witness James Monpas. For the reasons discussed below, we affirm the judgment of the district court.

## I. Sufficiency of the Evidence

As recognized by appellant, "the verdict of the jury must be sustained if there is substantial evidence in the record to support it, taking the view of the evidence most favorable to the government." *United States v. Schmidt*, 626 F.2d 616, 617 (8th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 278, 66 L.Ed.2d 136 (1980), *citing Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Viewing the evidence from this perspective, the facts are as follows. In the late 1960s, appellant became acquainted with James Monpas, who was at that time an assistant cashier in the installment loan department of the Gambles Continental Bank in St. Paul, Minnesota. Appellant was in the used car business; Monpas was the bank officer in charge of many of appellant's used car loans. In 1972 Monpas joined the Northwestern Bank of Commerce in Duluth as assistant vice-president in charge of the installment loan department. Appellant transferred most of his used car financing to Monpas at the Northwestern Bank of Commerce. During the mid-1970's, appellant began to have problems with his loans; many of his loan applications were irregular or incomplete when submitted. Nonetheless, Monpas approved appellant's loan applications.[3]

1. The Honorable Harry H. MacLaughlin, United States District Judge for the District of Minnesota.

2. The district court sentenced appellant to four years on count IV; to two years each on counts VII and IX, each sentence to run concurrently with the other and with count IV; to three years on count XIV, to run concurrently with counts IV, VII, and IX; and to two years each on counts V, XV, and XVI, each sentence to run concurrently with the others but consecutively with the sentences imposed on counts IV, VII, IX, and XIV. Execution of sentence was stayed pending appeal.

The indictment charged appellant with twenty-four counts of making materially false statements in loan applications (18 U.S.C. § 1014), obstruction of federal criminal investigations (18 U.S.C. § 1510), aiding and abetting the

making of false entries in bank statements (18 U.S.C. §§ 2, 1005), making materially false statements in loan applications for insurance (18 U.S.C. § 1010), and obstruction of justice (18 U.S.C. § 1503). Seven counts were dismissed without prejudice before trial upon the motion of the government because a material witness was missing; two counts were dismissed at the close of the government's case upon appellant's motion for judgment of acquittal. Of the fifteen counts submitted to the jury, appellant was convicted on seven counts and acquitted on eight counts. Following a hearing, the district court denied appellant's post-trial motions. This appeal followed.

3. Monpas was eventually charged in an indictment with thirteen counts of bank fraud and making false bank entries. In exchange for agreeing to testify truthfully in future trials,

In May, 1979, the FBI was investigating a loan made by the Northwestern Bank of Commerce in the name of Debra Dokka. Appellant had applied for and been granted a loan in the name of Debra Dokka. On May 15, 1979, Ms. Dokka told the FBI agents that the loan in question was not her loan. At trial Ms. Dokka testified that on May 16 appellant threatened her [4] and told her to call the FBI and to change her story about the loan. Ms. Dokka then called the FBI and stated that the loan was hers. This threat was the basis of count IV, endeavoring to obstruct a federal criminal investigation in violation of 18 U.S.C. § 1510. Before the grand jury and at trial, Ms. Dokka testified that she did not authorize appellant to take out the loan in her name and that she never received any of the money.

Count V charged appellant with aiding and abetting the making of a false entry in a bank statement in violation of 18 U.S.C. §§ 2, 1005, in connection with an FHA Title I home improvement loan. Donna Radich, a friend of appellant, and Monpas testified that in early January, 1978, appellant had discussed with them the possibility of Radich's applying for a $5,000 home improvement loan at the Northwestern Bank of Commerce through Monpas. Appellant persuaded Radich to apply for the loan. Although Radich told Monpas that she did not intend to use the loan for home improvements and that the money was for appellant, Monpas approved the loan. Radich turned the proceeds over to appellant.

Count VII charged appellant and his wife [5] with making a materially false statement in a loan application for $6,000 at the Plymouth State Bank. According to the loan application and what appellant told Robert Lexvold, the president of the bank, the loan was to finance the purchase of a 1978 Pontiac Trans Am for resale. The government submitted that the $6,000 was never intended to finance the acquisition of the car but was in fact intended for Arthur Freeman, a business associate of appellant, who used the money to settle pressing gambling debts. Freeman testified that he told appellant that he would repay the money very quickly and that he did receive $6,000 from appellant.

Count IX also involved Freeman. Freeman testified that in September, 1977, he needed money but was unable to arrange financing, that he authorized appellant to take out a $6,000 loan in his (Freeman's) name, and that he agreed to pay $1,000 as a finder's fee and to repay appellant $6,000 plus interest. Freeman partially paid off this loan. Then in January, 1978, appellant obtained a $12,100 loan in Freeman's name from the Northwestern Bank of Commerce. Freeman testified that he did not authorize appellant to obtain this second loan and in fact did not know about the loan until after it had been approved. Freeman further testified that he agreed to cash the second loan in exchange for $200 and that he gave the balance to appellant.

Count XIV charged appellant with aiding and abetting Monpas in making a false entry in a bank statement in connection with a $6,000 FHA Title I home improvement loan application by Ronald R. Vogler. Vogler and Monpas both testified that in October, 1976, they and appellant had dis-

---

Monpas was permitted to plead guilty to two counts of fraudulently issuing a bank note and making false entries in bank books in violation of 18 U.S.C. § 1005. In February, 1980, Monpas was sentenced to a total of nine years imprisonment. As discussed in text *infra*, Monpas subsequently filed a motion for reduction of sentence; the motion was pending at the time of appellant's trial.

4. According to Ms. Dokka's testimony, appellant first telephoned her and wanted to know what she had told the FBI agents. After she told him that she had told the FBI agents that

she knew nothing about the loan and that it was not hers, appellant became angry and abusive. Appellant then visited Ms. Dokka at work and told her that he wanted her to call the FBI and change her story. Ms. Dokka testified that appellant then said in a loud voice, "If you think I am going to let anyone up and testify against me or put me away for ten years, I will bury him first. I don't care if it's man, woman or child."

5. The federal magistrate granted Gloria Segal's motion for severance.

cussed the possibility of Vogler's obtaining an FHA home improvement loan through Monpas at the Northwestern Bank of Commerce and then giving the proceeds to appellant, who apparently needed the money for investment. Vogler testified that he wrote a check to appellant for $6,000 and then submitted the FHA loan application for $6,000 to Monpas. Monpas testified that he approved the loan even though he knew that Vogler had no intention of using the money to make home improvements and that the money was intended for appellant. Monpas further testified that he deposited the loan proceeds in Vogler's checking account.

Counts XV and XVI charged appellant with making materially false statements in a $7,500 loan application. This loan involved William LaBarre, a business acquaintance of appellant. LaBarre owned a service station and in November, 1977, he needed money to move to a better location. LaBarre testified that he had discussed his financing problems with appellant and that appellant brought up the idea of a loan. LaBarre testified that appellant said he could get a loan and that they agreed the amount of the loan would be $3,500–$4,500. LaBarre further testified that he agreed to pay appellant a finder's fee and to give appellant the titles to two vehicles (a 1969 Toyota and a 1965 Ford truck) to use as collateral. Appellant obtained a loan for $7,500 through Monpas. Appellant in the loan application falsely stated that LaBarre wanted him to obtain a $7,500 loan and that LaBarre wanted to use four vehicles as collateral. LaBarre testified that he did not own and did not intend to use the two additional vehicles (a 1969 Buick and a 1971 International Scout). LaBarre received $4,500 and appellant kept the balance of $3,000 as a finder's fee.

Appellant testified in his own defense and asserted that in each instance the government's witnesses either misrepresented the facts or were fully aware of the facts or that he had been authorized to obtain the loans on their behalf. With respect to the obstruction of a federal criminal investigation (count IV), appellant testified that he did not threaten Ms. Dokka and that he did not prevent her from further communication with the FBI but in fact encouraged her to call the FBI and to tell the truth.

■ We have carefully reviewed the record, taking the view of the evidence most favorable to the government. In each count the jury was presented with two conflicting stories; however, questions as to the credibility of witnesses and the weight to be given each witness' testimony are to be resolved by the jury. We conclude there was sufficient evidence in the record to support the jury verdicts.

■ Only count IV merits further discussion. Appellant argues that, assuming his conversation with Ms. Dokka was a "threat," *see* note 4 *supra,* the threat was not made for the purpose of preventing Ms. Dokka from future communication with the FBI. Appellant contends that a threat of retaliation for past communication with a criminal investigator, although reprehensible, does not violate 18 U.S.C. § 1510, citing *United States v. San Martin,* 515 F.2d 317, 320–21 (5th Cir. 1975). While we agree with appellant's construction of 18 U.S.C. § 1510,[6] we must disagree with his interpretation of the threat as referring only to past communication.

Title 18 U.S.C. § 1510 "was designed to deter the coercion of potential witnesses by the subjects of federal criminal inves-

---

6. 18 U.S.C. § 1510 provides in part:

(a) Whoever willfully endeavors by means of bribery, misrepresentation, intimidation, or force or threats thereof to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator; ...

. . . .

Shall be fined not more than $5,000, or imprisoned not more than five years, or both.

(b) As used in this section, the term "criminal investigator" means any individual duly authorized by a department, agency, or armed force of the United States to conduct or engage in investigations of or prosecutions for violations of the criminal laws of the United States.

tigations prior to the initiation of judicial proceedings." The statute was intended to close a loophole in former laws which protected witnesses only during the pendency of a proceeding.

A literal reading of the provision of the statute under consideration indicates that it is aimed at deterring interference with future communication of information. It does not prohibit the making of a threat, as opposed to the infliction of bodily injury, in retaliation for having communicated information to a criminal investigator, at least where such a threat cannot be interpreted as having· been intended to interfere with future communication of additional information or with continued cooperation.

*United States v. San Martin, supra,* 515 F.2d at 320 (citations omitted); *see also United States v. Williams,* 470 F.2d 1339, 1342 (8th Cir.), *cert. denied,* 411 U.S. 936, 93 S.Ct. 1912, 36 L.Ed.2d 396 (1973). In *San Martin* the court found that "the language used [by the defendant in a telephone call] and the circumstances surrounding its use [could] be viewed as no more nor less than a threat of retaliation for damage resulting from past communication.... Such an act, however despicable or deplorable, is outside the scope of § 1510." 515 F.2d at 321.

Here, we think the language used and the circumstances surrounding its use, *see* note 4 *supra,* provided a basis in the record for the jury to infer that the purpose of the conversation was to interfere with future communication. *Compare United States v. San Martin, supra,* 515 F.2d at 320–21. Appellant knew that Ms. Dokka had been interviewed by the FBI agents. He also knew that she had initially told the FBI she knew nothing about the loan. At this point appellant directed Ms. Dokka to call the FBI and change her story; appellant in effect told her that he had no intention of being "put away" by anyone's testimony.[7] Ms. Dokka immediately called the FBI and changed her story about the loan. Under these circumstances, the jury could have interpreted appellant's conversation with Ms. Dokka as a threat intended to interfere with her future communication with the FBI agents.

## II. *Closing Argument*

Appellant next argues that the government attorney in closing argument improperly vouched for the credibility of government witnesses[8] and improperly expressed his personal opinion on the merits of the case.[9] Appellant argues that the government attorney's closing argument was prejudicial and deprived him of a fair trial,

---

**7.** Appellant also stresses that the word "testify" refers to judicial or grand jury proceedings. Appellant thus argues that this threat may have violated another statute, 18 U.S.C. § 1503, which proscribes interference with witnesses during the pendency of judicial proceedings, but did not violate 18 U.S.C. § 1510, which proscribes interference or obstruction of future communication with a criminal investigator. As defined in 18 U.S.C. § 1510(b), "criminal investigator" refers to an "individual duly authorized by a department, agency, or armed force of the United States to conduct or engage in investigations or prosecutions for violations of the criminal laws of the United States." We think appellant is reading the word "testify" too narrowly. The circumstances surrounding appellant's use of the word "testify," particularly Ms. Dokka's recent interview with the FBI and appellant's apparent distress over the conduct of that interview, provided the jury a basis from which to infer that appellant intended to affect Ms. Dokka's future communication with the FBI agents.

**8.** For example, appellant challenges the following as an example of the government attorney's improperly vouching for the credibility of government witness Donna Radich:

I am sure the defense counsel is going to say, well, she had immunity so you don't believe her, but the government had a choice to give immunity to Segal or Donna Radich when we indicted Monpas. We chose to give it to Donna Radich. And along with immunity comes the obligation of the witness to testify truthfully, and I will leave that up to you whether Donna Radich testified truthfully or not.

**9.** As an example of an improper comment on the merits of the case, appellant cites the following: "In this case the evidence I think is overwhelming that the case has been proved beyond a reasonable doubt. I think when the defendant took the stand and testified that was made pretty clear, but that's not the test."

citing *United States v. Roberts*, 618 F.2d 530 (9th Cir. 1980), and *United States v. Garza*, 608 F.2d 659 (5th Cir. 1979).

"[W]e note the trial court has broad discretion in controlling closing arguments. Absent a showing of abuse of discretion this court will not reverse. 'The dominating question, always, is whether the argument complained of was so offensive as to deprive the defendant of a fair trial.'" *United States v. Bohr*, 581 F.2d 1294, 1301 (8th Cir.) (citations omitted), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). "The facts of each case must be reviewed independently to ascertain whether the comment was 'unduly prejudicial' or was 'plainly unwarranted and clearly injurious.' Reversal is in order only if the court determines that the jury verdict could reasonably have been affected by the argument." *United States v. Splain*, 545 F.2d 1131, 1135 (8th Cir. 1976) (citations omitted); *see also United States v. King*, 616 F.2d 1034, 1040 (8th Cir.), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 829 (1980).

The role of the attorney in closing argument is "to assist the jury in analyzing, evaluating and applying *the evidence*. It is not for the purpose of permitting counsel to 'testify' as an 'expert witness.' The assistance permitted includes counsel's right to state his [or her] contention as to the conclusions that the jury should draw from the evidence." To the extent an attorney's closing argument ranges beyond these boundaries it is improper. Except to the extent [counsel] bases any opinion on the evidence in the case, [counsel] may not express his [or her] personal opinion on the merits of the case or the credibility of witnesses. Furthermore, [counsel] may not suggest that evidence which was not presented at trial provides additional grounds for finding [the] defendant guilty.

*United States v. Garza, supra*, 608 F.2d at 662–63 (citations omitted; emphasis in original); *see also United States v. Roberts, supra*, 618 F.2d at 533–34; *United States v. Splain, supra*, 545 F.2d at 1134–36.

 We have carefully reviewed the challenged portions of the government attorney's closing argument and find no reversible error.[10] In our view the government attorney in explaining in closing argument the decision to grant immunity to particular government witnesses did not express personal assurances of their veracity or "bolster [their] credibility by reference to matters outside the record," *United States v. Roberts, supra*, 618 F.2d at 533. Nor do we find that the government attorney improperly expressed his personal opinion on the merits of the case. Here, the government attorney's comment can be fairly read as an expression of "personal belief in the guilt of the accused . . . based on the evidence adduced at trial . . . [which did not lead the jury] to believe that the opinion [was] based on evidence not included in the record." *United States v. Splain, supra*, 545 F.2d at 1135 n.2, *citing Schmidt v. United States*, 237 F.2d 542, 543 (8th Cir. 1956). *Compare United States v. Splain, supra*, 545 F.2d at 1134–36 (prosecutor improperly stated the jury could infer guilt merely on basis that defendant had been indicted; held error but not plain error in view of substantial and persuasive evidence of guilt; no *per se* rule). We of course admonish the government to scrupulously observe the highest standard of fairness in closing argument.[11]

---

**10.** As recognized in appellant's brief, appellant's counsel did not effectively object to the government attorney's closing argument. We have considered this allegation of error as "plain error." Under plain error, the question for determination is whether "the argument was so prejudicial as to have 'affected substantial rights resulting in a miscarriage of justice.'" *United States v. Splain*, 545 F.2d 1131, 1136 (8th Cir. 1976), *citing United States v. Big Crow*, 523 F.2d 955, 960–61 (8th Cir. 1975),

*cert. denied*, 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976).

**11.** The question of guilt or innocence rests with the jury and the prosecutor has no authority to sit as a "thirteenth juror" and cast a ballot on this issue. The prosecutor, as a representative of the Government in a criminal trial, must never lose sight of his [or her] duty to secure justice, to seek acquittal of the innocent and conviction of the guilty. While [the prosecutor] may prosecute vigorously,

### III. *Plea Agreement*

Appellant finally argues that the case should be remanded for an inquiry into the circumstances of the plea agreement between the government and key government witness James Monpas. Monpas was the loan officer through whom appellant obtained many loans by submitting false or incomplete loan applications. Monpas was indicted on thirteen counts of bank fraud and making false bank entries. In exchange for agreeing to testify truthfully in future trials, Monpas was permitted to plead guilty to two counts and the other counts were dismissed. In February, 1980, the district court (the Honorable Miles Lord) sentenced Monpas to a total of nine years imprisonment. The district court further noted at the sentencing proceeding that "I will anticipate that I will be entertaining a motion to reduce this sentence at some time in the future, after he's finished his cooperation with the federal officials." Brief for Appellant, App. B at 7. Monpas subsequently filed a motion for reduction of sentence pursuant to Fed.R.Crim.P. 35(b); [12] the motion was pending at the time of appellant's trial.

Appellant admits that there is no indication in the record of an actual promise on the part of the government to recommend reduction of sentence in return for Monpas' testimony. Appellant argues, however, that there are indications in the record that there may have been an implied promise. Appellant notes that at Monpas' sentencing, both Monpas' attorney and the sentencing judge referred to Monpas' future cooperation with the government. Appellant also notes that at the post-trial hearing the government attorney stated that, after appellant's trial, he told Judge Lord that he would recommend reduction of Monpas' sentence.[13]

■ At trial Monpas testified that no promises had been made by the government to assist him with his pending motion for reduction of sentence in return for his testimony. An affidavit submitted by the government attorney indicated that a promise to recommend reduction of Monpas' sentence was not part of the plea agreement. The district court found no promise had been made as part of the government's plea agreement with Monpas. *United States v. Segal*, No. CR–4–80–41 (D.Minn. Aug. 18, 1980) (order denying post-trial motions) (slip op. at 3–4). We cannot say that this finding is clearly erroneous. We note that Monpas' plea agreement was disclosed to the jury and that the potential effect of his situation on his credibility as a witness was argued to the jury. Full disclosure of the terms of the plea agreement thus distinguishes the present case from *United States v. Bigeleisen*, 625 F.2d 203, 206–08 (8th Cir. 1980) (partial disclosure, witness denied agreement), *citing Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (witness denied agreement), *and United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977) (partial disclosure of agreement).

---

he [or she] must do so fairly. In assuming a partisan position and expressing his [or her] personal opinion of [the] defendant's guilt or innocence, the prosecutor is transgressing [the] inviolate responsibility of objectively, yet forcefully, presenting the Government's case at trial and leaving the ultimate question of innocence or guilt to the jury. A personal expression of [the] defendant's culpability, which inserts an extraneous and irrelevant issue before the jury, is particularly objectionable and highly improper when made by the prosecutor, whose position of public trust and experience in criminal trials may induce the jury to accord some unwarranted weight to the comment.

*United States v. Splain, supra,* 545 F.2d at 1134–35.

12. Fed.R.Crim.P. 35(b) provides in part:

The court may reduce a sentence within 120 days after the sentence is imposed, or within 120 days after receipt by the court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 120 days after entry of any order or judgment of the Supreme Court denying review of, or having the effect of upholding, a judgment of conviction.

13. During oral argument the government attorney stated that he did recommend that Monpas' sentence be reduced and that this action was purely voluntary and not undertaken pursuant to any agreement.

Accordingly, the judgment of the district court is affirmed.